## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL NEWS SERVICE, INC.**<br>**1000 Vermont Ave. NW Suite 500**<br>**Washington, D.C. 20005**<br><br>(Plaintiff)<br><br>v.<br><br>**POYNTER INSTITUTE FOR**<br>**MEDIA STUDIES,**<br><br>**TIMES PUBLISHING COMPANY,**<br><br>**CONGRESSIONAL QUARTERLY, INC.,**<br><br>**CQ TRANSCRIPTIONS, INC.,**<br><br>**MORNINGSIDE PARTNERS, LLC,**<br><br>**ROBERT MERRY,**<br><br>**STEPHEN CARR-DAVIS,**<br><br>**AND**<br><br>**ANTHONY O'BRIEN**<br><br>(Defendants) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 09 1226 RMU
**JURY TRIAL DEMANDED**

### AMENDED COMPLAINT

Plaintiff Federal News Service, Inc. ("FNS") brings this Complaint for injunctive relief

and damages against Defendants Congressional Quarterly, Inc. ("CQ") and CQ Transcriptions,

Inc. ("CQ Transcriptions"), their parent companies, Times Publishing Company of St.

Petersburg, Florida ("Times Publishing Company") and the Poynter Institute for Media Studies

of St. Petersburg, Florida ("Poynter Institute"), and Morningside Partners, LLC ("Morningside"),

RECEIVED

OCT 1 5 2009

Clerk, U.S. District and
Bankruptcy Courts

Robert Merry, Stephen Carr-Davis, and Anthony O'Brien (collectively "Defendants").  Based

upon personal knowledge as to itself and its own acts, and upon information and belief as to all

other matters, FNS alleges the following:

### PARTIES AND BACKGROUND

1.      FNS was founded in 1985.  It is a small company in the business of producing and

selling fast turnaround verbatim transcripts of a variety of news events involving the federal

government, including speeches, statements, and press conferences from the White House,

Congress, and federal agencies, to clients demanding fast turnaround of the transcripts.  FNS's

clients include branches of various U.S. government agencies, foreign embassies located in

Washington, D.C., Washington bureaus of news media, lobbying offices of corporations,

government-relations staff of professional and trade associations, and law firms.  FNS also

provides private transcription and production services.

2.      Defendant CQ is recognized as the nation's leading publisher of news and

information on politics, public policy, and legislative activity at the federal, state, and local

levels.  It is a large company with nearly 170 reporters, editors and researchers covering Capitol

Hill and Washington, D.C.  Defendant Merry was the President and CEO of CQ from 1997 until

July 21, 2009.  On July 21, 2009, CQ's assets were sold to Roll Call, a unit of The Economist

Group, a privately held company based in England.  Roll Call now controls CQ's business.

Defendant CQ competes with FNS in the businesses of selling fast turnaround verbatim

transcripts of a variety of news events involving the federal government, private transcription,

and production services.  Defendant CQ also produces and sells daily Capitol Hill schedules,

news updates, full-length articles analyzing Congress, information on all Congressional bills

scheduled for floor consideration, and a legislative tracking product that provides users a

collection of databases to track the movement of Congressional bills as they move through Congress.  Defendant CQ's product line includes CQ Weekly, CQ Today, CQ.com, CQ Homeland Security, CQ Budget Tracker, CQ HealthBeat, CQ MoneyLine, CQ Politics and Governing Magazine.

3.      Defendant CQ is the sole competitor of FNS in the sales of fast turnaround verbatim transcripts of a variety of news events involving the federal government.  On October 12, 2004, CQ acquired the assets of Federal Document Clearing House e-Media ("FDCH"), including fast turnaround verbatim transcript subscription contracts with major media outlets. CQ created a subsidiary, CQ Transcriptions, to manage these assets.  CQ is a wholly owned affiliate of the Times Publishing Company, which is owned by the Poynter Institute.  The Times Publishing Company publishes the St. Petersburg Times, Florida's largest daily newspaper.  The St. Petersburg Times is considered one of the country's top ten newspapers.

4.      In 1992, Defendants, Stephen Carr-Davis, Anthony O'Brien, and two other partners founded FDCH.  In 1995, FDCH purchased Reuters Transcript Service from Reuters News Agency.  On October 12, 2004, FDCH was sold to CQ.  Following or around the time of the sale, Defendants Carr-Davis and O'Brien founded a variety of transcription publishing and syndication ventures through ASC Partners, LLC, including Sigma Support Corp. LLC., Morningside, Data Licensing, LLC, and Voxant, Inc.  Subsequent to the sale of FDHC to CQ, Morningside provided and produced transcripts exclusively for CQ through CQ Transcriptions. Morningside is the sole competitor of FNS in the production of fast turnaround verbatim transcripts of a variety of news events involving the federal government.  While Morningside is a separate and distinct legal entity from CQ Transcriptions and CQ, Defendants Carr-Davis and O'Brien, along with Defendant Merry, former President and CEO of CQ, sat on the board of CQ

Transcriptions.  CQ Transcriptions held board meetings where executives of Morningside and CQ communicated with each other regarding the business of producing and selling fast turnaround verbatim transcripts of news events involving the federal government.  Defendant Morningside had a contractual arrangement with CQ and/or CQ Transcriptions, whereby Morningside exclusively produced transcripts for CQ and/or CQ Transcriptions.  Morningside worked very closely with CQ and CQ Transcriptions in the production and distribution of transcripts to CQ's and CQ Transcriptions' customers.  CQ Transcriptions, through CQ, markets the transcripts to customers.

5.     In January 2009, Times Publishing Company announced its intention to sell CQ. In its announcement, CQ executives and staff were credited for creating a prosperous enterprise with market leading information products, due in part to a successful strategy of growth and innovation.  However, as made plain here, CQ's success was achieved in part by a pattern of illegal activities, anticompetitive business practices, and outright corporate theft of proprietary, confidential, and privileged information from its competition.  On July 21, 2009, Times Publishing Company agreed to sell CQ's assets to Roll Call.

6.     Plaintiff FNS is a Delaware corporation with its principal place of business in Washington, D.C.

7.     Defendant Poynter Institute is a Florida non-profit 501(c) (3) corporation with its principal place of business at 801 South Street, St. Petersburg, Florida 33701.

8.     Defendant Times Publishing Company is a Florida corporation with its principal place of business at 490 First Avenue South, St. Petersburg, Florida 33701.

9.     Defendant CQ is a Washington, D.C. corporation with its principal place of business at 1255 22nd Street N.W., Washington, D.C. 20037.

10.     Defendant CQ Transcriptions is a Delaware corporation with its principal place of business at 1255 22nd Street N.W., Washington, D.C. 20037.

11.     Defendant Morningside is a Maryland limited liability company with its principal place of business at 6515 Evening Shadows Court, Clarksville, MD 21029.

12.     Defendant Robert Merry is a citizen of Virginia, with his principal residence at 1313 Merrie Ridge Rd., McLean, VA 22101-1826.

13.     Defendant Stephen Carr-Davis is a citizen of Illinois, with his principal residence at 1301 N. Dearborn St. Apt. 306, Chicago, IL 60610-6094.

14.     Defendant Anthony O'Brien is a citizen of Maryland, with his principal residence at 6515 Evening Shadows Court, Clarksville, MD 21029.

<u>**JURISDICTION AND VENUE**</u>

15.     This Complaint states claims arising under the antitrust and unfair competition laws of the United States, the Digital Millennium Copyright Act, 17 U.S.C. §§ 1202 *et seq.*, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, as well as the laws of the District of Columbia.

16.     This Court maintains subject matter jurisdiction pursuant to 18 U.S.C. § 1030(g) and 28 U.S.C. §§ 1331, 1337, 1338(a), 2201, and 2202.

17.     This Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367 because these claims are so related to FNS's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

18.     This Court holds general and specific personal jurisdiction over the Defendants under 15 U.S.C. §§ 4 and 15.  This Court holds jurisdiction over Poynter Institute and Times

Publishing Company because executives from both companies knew of the actions alleged herein, approved of the actions alleged herein, and were involved in the decisions to undertake the actions alleged herein.

19.     Venue in this District is proper as to the Defendants pursuant to 15 U.S.C. §§ 5 and 15.

20.     Venue in this District is proper as to all parties pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## I.     INTRODUCTION

21.     Counts One and Two of this Complaint are actions for damages, injunctive and equitable relief, and costs and attorneys fees under D.C. Code §§ 36-40, the D.C. Uniform Trade Secrets Act, and common law misappropriation of "hot news."  These counts arise from Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) misappropriation and passing off of FNS's transcripts and misappropriation of FNS's trade secrets.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

22.     Count Three of this Complaint is an action for damages, injunctive and equitable relief, and costs and attorneys fees under 17 U.S.C. §§ 1202 *et seq.*, the Digital Millennium Copyright Act.  This count arises from Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) improper removal or alteration of copyright management information.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

23.     Counts Four through Seven of this Complaint are actions for damages under 18 U.S.C. § 1030 *et seq.*, the Computer Fraud and Abuse Act.  These counts arise from Defendants'

(CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unauthorized, illegal, and harmful access to computers and electronic data. Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

24.     Counts Eight through Twelve of this Complaint are actions for monetary damages and injunctive relief under Section 1 and Section 2 of the Sherman Act and the laws of the District of Columbia.  These counts arise from Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful and anticompetitive campaign to monopolize or attempt to monopolize the market for fast turnaround verbatim transcripts of a variety of news events involving the federal government as well as Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful agreements and conspiracy to restrain competition in the market for fast turnaround verbatim transcripts of a variety of news events involving the federal government.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

25.     As early as September 2004, during negotiation for the sale of FDCH to CQ, Defendants Merry, Carr-Davis and O'Brien agreed to eliminate competition by driving FNS out of business.  The plan was to go after all FNS accounts regardless of costs to destroy FNS and monopolize the market.  Defendant Carr-Davis agreed to head the effort to destroy FNS along with the help of the CQ sales team.  In September 2004, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) conspired to create and enact a plan to destroy and/or weaken FNS, its sole competitor in the production and sales of fast turnaround verbatim transcripts of a variety of news events involving the federal

government.  Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien), through their unlawful agreements and conspiracy, pursued a relentless campaign to drive FNS out of business or weaken FNS to the point that CQ could acquire FNS.  Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) sought to weaken FNS by engaging in corporate espionage and corporate theft on a grand scale.  Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) engaged in systematic, illegal access to and taking from FNS's computers and online databases.  Through this unlawful scheme, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) stole confidential materials and proprietary products with copyright and trademark notices on them.  Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Merry, Carr-Davis, and O'Brien) gained repeated and unauthorized access, in many cases by use of pretextual customer login credentials, to FNS's proprietary, password-protected customer website.  Defendants Merry, Carr-Davis, and O'Brien met and discussed their anticompetitive plans at CQ Transcription board meetings and through normal day to day business communications.  Since the sale of FDCH to CQ, Carr-Davis visited the CQ offices routinely.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

26.    Since September 2004 and to the present, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) engaged in corporate espionage to obtain proprietary, confidential and privileged FNS information; illegally accessed FNS computers and online databases in violation of numerous laws; and, obtained FNS verbatim news transcripts through fraudulent and illegal activities.  Once Defendants (CQ, CQ

Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) obtained possession of FNS transcripts, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr Davis, and O'Brien) altered the transcripts, removed FNS copyright and trademark notices, replaced them with CQ copyright and trademark notices, and provided those stolen transcripts to CQ's clients as CQ's and Morningside's own work product.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

27.     Each FNS news transcript contains copyright management information as that term is defined in 17 U.S.C. § 1202(c), including identification of FNS as the author and/or copyright owner of the news transcript, and symbols, such as "FNS" or "FEDERAL NEWS SERVICE", which refer to such information.  This information ordinarily appears in FNS transcripts when they are republished or redisplayed by FNS subscribers.  By systematically copying, rewriting, displaying and redistributing FNS's fast turnaround verbatim transcripts of news events involving the federal government without FNS's permission, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) are free riding on FNS's substantial investment and effort of generating accurate, time sensitive fast turnaround verbatim transcripts of a variety of news events involving the federal government.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

28.     Since September 2004 to the present, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) engaged in predatory hiring practices aimed at taking away key FNS personnel through offering excessive compensation levels; made false statements to the federal government as well as to private

customers that Defendant CQ was the sole provider of fast turnaround verbatim transcripts of a variety of news events involving the federal government; tried to acquire FNS through a bankruptcy proceeding to eliminate FNS from the relevant antitrust market; and, bundled Defendant CQ's non-transcript products, sometimes at no cost with its transcript products.  Since September 2004 to the present, all of these acts, taken in collaboration with each other, were part of a calculated, continuous, ongoing, and direct effort to eliminate FNS from the relevant antitrust markets.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.  FNS brings this Complaint to stop Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) illegal intrusions and theft; to prevent Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) from using the materials they illegally acquired to compete with FNS; to seek compensation for FNS's injuries caused by Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) pattern of unlawful conduct; and, to restore competition in the relevant antitrust product and geographic markets.

## II.   FAST TURNAROUND VERBATIM TRANSCRIPTS OF A VARIETY OF NEWS EVENTS INVOLVING THE FEDERAL GOVERNMENT

29.     The markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government are small in terms of revenue and customer base.  Prior to the sale of CQ assets to Roll Call on July 21, 2009, there were only two companies providing and two companies selling fast turnaround verbatim transcripts of a variety of news events involving the federal government:  FNS and Defendants CQ/CQ Transcriptions/Morningside.  FNS produces and sells its own transcripts.  CQ sold its transcripts to end use customers.  Morningside produced and supplied transcripts to CQ and/or CQ Transcriptions.  Therefore, FNS

competes with Morningside in the production of transcripts and FNS competed with CQ in the sale of transcripts to retail or end use customers.  While Roll Call now controls and operates CQ's assets, the structure of the market remains the same with only two competitors. Morningside still supplies transcripts to Roll Call.  Roll Call now sells to CQ's retail or end use customers.  A wide variety of government-related events are transcribed including legislative hearings, press conferences, government briefings and announcements, speeches, campaign activities, and so forth.  These transcript services are sold on a subscription basis using short-term contracts lasting between one and three years.  A variety of companies and government entities purchase subscriptions to transcription services for archival, research, or journalistic purposes.  Consumers of transcript subscriptions include:  government agencies, foreign embassies, news aggregators and distributors such as Lexis-Nexis and Factiva, Washington bureaus of news media, lobbying offices of corporations, government-relations staff of professional and trade associations, lobbying firms, and law firms.

30.     Private companies also sometimes pay for transcription services of their own events.  Purchasers of these transcription services include television news media, political talk shows, and private companies requiring transcriptions of their own public communications and press conferences.  These transcription services are different from fast turnaround verbatim transcripts of a variety of news events involving the federal government.

31.     Transcripts are created electronically, by specially trained transcribers. Transcripts are the unique creation of FNS or Defendants CQ/CQ Transcriptions/Morningside and each maintains its own particularized style and format.  That is, transcripts of the same event created by FNS and Defendants CQ/CQ Transcriptions/Morningside contain differences in describing background noises such as "(laughter)" or "(chuckles)," as well as differences in

paragraphing, punctuation, spacing, and different wording in the transcript itself.  Transcripts are the property of their respective creators, and marked prominently as such with copyright and trademark notices.  Because a fast turnaround is required by purchasers of verbatim transcripts, a quick, but rigorous, editing process is undertaken prior to publication.  Transcripts produced by FNS and Defendants CQ/CQ Transcriptions/Morningside in this manner are normally published the same day of the event, and are also available for viewing live via a "wire service" as the transcript is created.

32.     Most consumers of fast turnaround verbatim transcripts of a variety of news events involving the federal government do not purchase transcripts on a piecemeal basis, but rather most consumers purchase subscriptions to transcripts over a certain period of time.  FNS and Defendant CQ deliver transcripts to their customers in two ways depending on each customer's demands and service for which it paid:  online transcript database and/or wire service.  Delivery by the online transcript database provides the customer with the complete and finished product as it is posted to the database.  Delivery by the wire service provides clients with portions of a transcript as they are completed and posted to the wire service website. Authorized consumers can retrieve transcripts from the producers' website or have their transcripts delivered electronically.

**A.**     **The Production and the Sale of Fast Turnaround Verbatim Transcripts of a Variety of News Events Involving the Federal Government Are the Relevant Antitrust Markets**

33.     The relevant antitrust markets at issue in this litigation are the production and the sale of fast turnaround verbatim transcripts of a variety of news events involving the federal government.  Defendant Morningside produces fast turnaround verbatim transcripts of a variety of news events involving the federal government and sells them to Defendants CQ and CQ

Transcriptions.  Defendants CQ/CQ Transcriptions sell fast turnaround verbatim transcripts of a variety of news events involving the federal government to its customers.  News events involving the federal government include, but are not limited to:  major Congressional hearings; speeches, statements and press conferences by administration leaders and spokespersons; speeches, statements and press conferences by Congressional leaders and spokespersons; Presidential statements, press conferences and interviews; White House briefings; State Department briefings; Defense Department briefings; Justice Department briefings; Homeland Security briefings; U.S. Trade Representative briefings; Foreign Press Center briefings; speeches and press conferences by visiting international leaders; and, political interviews on morning and weekend TV news shows.

34.     Consumers of fast turnaround verbatim transcripts of a variety of news events involving the federal government include news media, news aggregators, U.S. government agencies, foreign embassies, lobbying firms and law firms.  These consumers demand fast turnaround verbatim transcripts because they need to know or to report promptly what was actually said by government officials relating to their or their client's interests.  News media outlets, for example, demand fast turnaround verbatim transcripts to help them prepare timely news reports.

35.     Consumers do not consider transcripts provided by government agencies or public relations offices to be substitutes because government agencies or public relations offices do not offer a speedy turnaround following the event as their transcripts are made available days, weeks, or months later.  Similarly, consumers do not consider news briefs or wire reports to be substitutes because consumers require a complete verbatim transcript for archival or source material.  Consumers do not consider the internet, which occasionally provides access to

prepared statements that may be posted online by Congressional committees and government officials, to be a substitute for verbatim transcripts, as they lack the breadth of content provided by verbatim transcript subscriptions.  Though the media industry underwent significant change since 1995 with the introduction of the internet, the internet's resources are not adequate substitutes for fast turnaround verbatim transcripts.  Consumers purchase transcripts from Defendants CQ/CQ Transcriptions/Morningside and FNS because they are interested in what was actually said, which often includes questions and answers, and variations or additions to a prepared statement.  Internet based resources do not provide a practical alternative to FNS and Defendants CQ/CQ Transcriptions/Morningside because these resources only provide news briefs and/or commentary, not the entire transcript verbatim.  Consumers use FNS and/or Defendants CQ/CQ Transcriptions/Morningside for these services.  There are no substitutes to which consumers would switch in response to a small but significant and non-transitory increase in the price for fast turnaround verbatim transcripts of a variety of news events involving the federal government.

36.     Consumers of fast turnaround verbatim transcripts of a variety of news events involving the federal government can be generally divided into four groups:  private media and news companies; U.S. government agencies; embassies; and, news aggregators.  Private media and news companies make up the largest and most volatile section of the market, as they are the most responsive to direct sales and marketing.  Government agencies and embassies go through a bidding process and are therefore more stable.  News aggregators such as Lexis-Nexis often contract with both Defendant CQ and FNS in order to provide their downstream customers with all available news information.

37.     The Federal Trade Commission ("FTC") investigated the fast turnaround verbatim transcript business and negotiated consent agreements with FNS and Reuters America to resolve antitrust concerns related to their alleged anticompetitive agreement to allocate news transcript customers and fix prices charged to transcript customers.  According to the FTC complaint, FNS and Reuters America directly competed for news transcript customers and the FTC confirmed that FNS and Reuters America were the only two firms providing the service. Allegedly, Reuters America agreed not to produce or sell any news transcripts that competed with FNS-produced news transcripts and Reuters America agreed not to sell news transcripts below a monthly price of $500.  The FTC found the agreements to be anticompetitive and claimed that the agreements eliminated or restrained competition in the production and sale of verbatim news transcripts.  In fact, the FTC stated that as a result of the agreement not to compete, "FNS became the sole supplier of news transcripts."  While the FTC's action took place nearly fourteen years ago, the production and sale of fast turnaround verbatim transcripts of a variety of news events involving the federal government is still a relevant antitrust market today and the structure of the market remains essentially the same.  FNS and CQ are the only two firms supplying fast turnaround verbatim transcripts of a variety of news events involving the federal government.

38.     The FTC defined the production and sale of "fast turnaround verbatim transcripts of statements made by governmental officials or others covering a variety of news events or individual news events or parts thereof that are usually but not always produced within three (3) hours of the event and transmitted in any manner to resellers and customers in the United States" as a relevant antitrust market in 1995.  (December 18, 1995, FTC File No. 941-0015).

Importantly, the FTC specifically found that non-transcript products such as the "Daybook" daily calendar of news events, was not a part of the relevant market.

39. Since the 1995 FTC investigation, the fast turnaround verbatim transcript industry barely changed. The only significant difference is that producers deliver transcripts much faster. Transcripts are now generally available on a same-day basis, or instantaneously through "wire service" products, which allow the customer to read the transcript as it is being written. These methods of delivery are available to all customers.

40. The production and the sale of fast turnaround verbatim transcripts of a variety of news events involving the federal government are characterized by high entry barriers. Since 1993, there have only been two firms competing in the production and the sales of fast turnaround verbatim transcripts of a variety of news events involving the federal government. The fact that no third competitor entered any relevant antitrust market in over fifteen years suggests that entry is unlikely. The markets for production and the sale of fast turnaround verbatim transcripts of a variety of news events involving federal government have always been relatively small. Presently, the markets are shrinking as news media customers are either consolidating or going out of business. It is highly doubtful that any new firm will enter the relevant markets.

**B.   The United States is the Relevant Geographic Market**

41. The corresponding relevant geographic market is the United States. Consumers of fast turnaround verbatim transcripts of a variety of news events involving the federal government operate nationwide. Fast turnaround verbatim transcripts of a variety of news events involving the federal government are transmitted and viewed electronically via the internet, allowing customers nationwide fast access to transcripts.

III.    **DEFENDANTS' ILLEGAL CONDUCT**

42.     Through a continuing pattern of illegal and anticompetitive conduct, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) agreed and conspired to restrain competition, obtained and maintained a monopoly, or possessed a dangerous probability of obtaining a monopoly in the production and the sale of fast turnaround verbatim transcripts of a variety of news events involving the federal government.  As detailed below, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) agreed and conspired to restrain competition and obtain and maintain this monopoly, or possessed a dangerous probability of obtaining this monopoly, by exclusively dealing with each other, by engaging in anticompetitive activities including industrial espionage, corporate theft of trade secrets, misappropriation of confidential information and work product, predatory hiring practices, illegal bundling of products at no cost, misappropriation of transcripts, and tortious interference with actual and prospective contracts.  Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) engaged in and continue to engage in these illegal practices with the intent of harming FNS, weakening FNS, and eventually eliminating FNS, their only competitor from the production and the sale markets.  Through these illegal practices, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) plan to dominate and control the markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government without the threat of any competition.   Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

A.      **CQ's Plan to Weaken and Acquire FNS**

43.     On October 12, 2004, Defendants Carr-Davis and O'Brien sold FDCH to CQ. Since this sale, Defendants Carr-Davis and O'Brien sat on the board of directors of CQ Transcriptions, along with Defendant Merry, the former CEO and President of CQ prior to CQ's sale to Roll Call in July of 2009.  Defendants Carr-Davis and O'Brien formed Morningside around the time of the sale of FDCH to CQ.

44.     Since September 2004 to the present, Defendant Morningside, through Defendants Carr-Davis and O'Brien, and Defendants CQ and CQ Transcriptions, through Defendant Merry, consciously and aggressively implemented their illegal and anticompetitive plan to take business from FNS in an effort to eventually dominate and control the markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government.  Executives from the Poynter Institute and the Times Publishing Company, the parent corporations of CQ and CQ Transcriptions, were aware of and approved these efforts. Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) were not concerned about increasing their own profit margins.  Rather, Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) goal was to harm and weaken FNS through various anticompetitive and predatory tactics.  FNS's owner filed for bankruptcy in November 2004 and Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr Davis, and O'Brien) started their campaign to weaken and destroy FNS in an effort to acquire FNS, its only competitor.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

45.     Upon information and belief since September 2004 to the present, Defendants Carr-Davis, O'Brien, and Merry used board of directors meetings as well as routine regular day to day communications resulting from the CQ/CQ Transcriptions/Morningside supply arrangement to discuss the various methods they would employ to drive FNS out of business. Indeed, Defendant Morningside, through Defendants Carr-Davis and O'Brien, worked very closely with Defendants CQ and CQ Transcriptions in dealing with the customers of CQ and CQ Transcription.

46.     In 2008, Defendant Merry communicated to CQ's employees that CQ had been interested in acquiring FNS since September 2004. Defendants CQ and CQ Transcriptions initially attempted to acquire FNS assets in 2005 and continued to pursue this acquisition strategy through the present. Cheryl Reagan acquired an interest in FNS in January 2001. In February 2002, Cheryl Reagan acquired 100% ownership interest in FNS. On July 8, 2005, CQ and CQ Transcriptions expressed their interest in acquiring certain FNS assets in the context of Mrs. Reagan's personal bankruptcy proceedings, which were initiated on November 17, 2004, in the U.S. Bankruptcy Court for the Western District of Arkansas (Case No. 6:04-bk-77590). On November 11, 2005, CQ's publisher and president, Defendant Merry sent a letter to Mrs. Reagan's bankruptcy counsel, James Dowden, formally proposing to acquire FNS assets including: FNS's client contracts for the purchase of government proceedings transcripts; FNS's client contracts for Russia and Israel; and FNS's client contracts for its domestic monitoring business. On December 9, 2005, Defendants CQ and CQ Transcriptions again extended an offer to purchase FNS assets. Defendants CQ and CQ Transcriptions monitored Mrs. Reagan's personal bankruptcy proceedings in an effort to purchase FNS assets.

47.     In view of CQ's clear intentions to acquire FNS assets, FTC antitrust lawyers contacted CQ in the spring of 2006 to assess CQ's interest in acquiring its sole competitor. Defendants CQ and CQ Transcriptions withdrew the offer to purchase FNS assets in 2006 after determining the assets were not for sale.  However, Defendants CQ's and CQ Transcriptions' lawyers and Defendant Merry continued to monitor and actively participated in Mrs. Reagan's bankruptcy proceedings.

48.     Defendant CQ continued its pursuit of FNS throughout Mrs. Reagan's bankruptcy proceedings.  CQ made a formal bid to acquire FNS from the bankruptcy estate of Cheryl Reagan through a letter of intent ("LOI") dated March 10, 2008.  CQ offered to purchase FNS for $2,600,000.  CQ's LOI demonstrates CQ's interest and intent to damage its only competitor. During the due diligence process, CQ demanded highly sensitive, confidential business information from FNS, which indicated CQ's anticompetitive and predatory intent in seeking control of FNS.  CQ's LOI requested the right to inspect FNS's customer list by product, contracts, new sales, renewals, rates for new customers, renewal rates, employee lists by functions, contractor lists, and financial records for a period of sixty days.  CQ's LOI also sought the right to interview FNS's customers and suppliers.  This conduct is predatory, anticompetitive and illegal under the antitrust laws.  CQ was unsuccessful in its inappropriate attempt to obtain competitively sensitive data through the due diligence process that could have been used to harm FNS even further.  Indeed, CQ's LOI required that simultaneously with the closing, the Trustee conducting the sale execute non-competition agreements on the behalf of FNS and Cheryl Reagan.  Under the non-competition agreements, FNS and Mrs. Reagan would not compete with any FNS enterprises purchased by CQ for three years.  In addition, CQ's LOI made clear that

FNS employees would not be retained by CQ, demonstrating that the sole purpose for the acquisition was to eliminate competition.

49.     On March 26, 2008 at the Cosmos Club in Washington, D.C., CQ CEO Defendant Merry and CQ Senior Vice President Keith White ate lunch with the then-CEO of FNS, who took the meeting with the understanding that they would only discuss public issues relating to a potential sale of FNS.  The CEO of FNS intended to discuss generally the state of FNS and share, if necessary, public, non-proprietary business information.  At the meeting, Defendant Merry informed FNS's CEO of CQ's intent to buy FNS, and of the LOI executed earlier. Defendant Merry insisted on beginning due diligence that day, including a review of all FNS business and financial information as well as FNS proprietary information.  Defendant Merry used aggressive, strong-arm tactics in an attempt to enter FNS offices that day with the goal of reviewing competitively sensitive information and speaking directly to FNS staff.  FNS's CEO responded that he held a fiduciary duty to protect the assets of the company and was not in a position to provide CQ, its sole competitor, with unfettered access to FNS's confidential information.  When his initial tactic failed, a frustrated Defendant Merry bribed the CEO with a personal payment to be made at that time, on the spot, of $10,000, then $50,000, to allow him to proceed with his desired due diligence that day.  This offer was also refused.  After some additional comments, the lunch meeting ended.

50.     On May 16, 2008, the bankruptcy court approved the sale of FNS to CQ subject to various conditions including a sixty day waiting period that began on April 18, 2008 to allow for competing bids.  A competing, and superior, bid was forthcoming and FNS was ordered to be sold to TIG Capital Inc ("ITG").   The bankruptcy trustee paid CQ $50,000 as a break up fee when the bankruptcy court ordered the sale to TIG.  CQ put the $50,000 in escrow and continued

to oppose the sale to TIG.  CQ has been and continues to be very involved in the bankruptcy proceeding from commencement through the present.  On August 14, 2009, CQ filed an opposition to the bankruptcy trustee's motion to extend the time for TIG to pay for FNS.  On August 19, 2009, the bankruptcy court held a hearing on the motion to extend time for payment of FNS.  At the hearing, CQ was represented by the same law firm that represents Morningside in this lawsuit.  Defendants (CQ, CQ Transcriptions, and Morningside) continue their unabashed pursuit of FNS.  On September 3, 2009, CQ filed a motion to vacate the order granting the trustee's motion to confirm the sales price of FNS.  CQ's motion demanded that the sale of FNS be set aside and stated that CQ would return the $50,000 break up fee to the trustee if the sale was set aside.  On September 21, 2009 the bankruptcy court vacated the sale of FNS to TIG and ordered the trustee to seek new sealed bids for FNS.  Defendant CQ and CQ Transcriptions continue to monitor the activities of the bankruptcy court and the potential sale of FNS.

51.     Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) continuing pattern of illegal anticompetitive conduct, including their pursuit of FNS through the bankruptcy proceedings, clearly demonstrates Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) intent to cause financial and structural harm to FNS, with the goal of weakening FNS financially to such an extent that Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) either acquire FNS or destroy it so FNS exits the market.

**B**.     **Espionage Through FNS Employee Elizabeth Pennell**

52.     Elizabeth Pennell was an employee of FDCH prior to working for FNS. Subsequently, FNS hired Ms. Pennell as a consultant in 2003, and she became a full time

employee of FNS in 2004, until her termination in February 2005.  On September 16, 2003, Ms.

Pennell signed a confidentiality, non-disclosure, and non-compete agreement with FNS.  The

agreement contemplated that Ms. Pennell would have access to FNS's highly confidential

business information and required her to hold all such confidential information in confidence,

both during and after her employment.  She agreed not to directly or indirectly disclose or

transfer any confidential information to any person or entity.  In addition, Ms. Pennell signed a

conflict of interest statement on February 1, 2004, where she claimed that she was not working

for a competitor in any way, and that she was not receiving any commissions, retainers, bribes,

kickbacks, and/or gifts for services adverse to FNS's interests.  Ms. Pennell's main job with FNS

was business development, focusing on media business.  Following her termination, Defendants

Carr-Davis and O'Brien, the owners of Morningside, re-hired Ms. Pennell and she is currently a

Morningside employee.

53.     While Ms. Pennell was an FNS employee, she was paid by Defendants CQ, CQ

Transcriptions, or Morningside under the direction of Defendant O'Brien to steal FNS

confidential business information, which was of value to Defendants CQ, CQ Transcriptions, and

Morningside in their efforts to diminish the value of FNS as a competitive entity.  Throughout

her employment at FNS, Ms. Pennell regularly met and communicated with Defendant O'Brien

initially while he was at FDCH, and later when Defendant O'Brien was at Morningside and on

the board of CQ Transcriptions.  Ms. Pennell provided Defendant O'Brien with FNS's

confidential business information.  Ms. Pennell also supplied Defendant O'Brien with privileged

and confidential communications between Mrs. Reagan and her attorneys regarding Mrs.

Reagan's bankruptcy proceedings.  Ms. Pennell undermined the competitive position of FNS in

the relevant antitrust markets.  She violated her contractual obligations to FNS as well as FNS

business practices by giving internal FNS documents and confidential information to FDCH, and Defendants Morningside and CQ.  Ms. Pennell also enticed an FNS employee, Stephen Chilcoate, to quit FNS to work for Defendants CQ and/or CQ Transcriptions.  The stolen FNS confidential business information was used by Defendants Morningside, CQ, and CQ Transcriptions to disadvantage FNS in the marketplace.

54.     Most importantly, Ms. Pennell illegally obtained FNS's client lists and delivered them to Defendants CQ, CQ Transcriptions, and Morningside through Defendant O'Brien in violation of Ms. Pennell's confidential obligations to FNS.  The client list not only included the specific individual contacts at each customer, but also provided their contractual information, including how much each customer was paying FNS for transcript services.  Possession of the precise contacts of FNS customers and the contract prices they were paying for transcription subscriptions gave Defendants CQ, CQ Transcriptions, and Morningside an advantage in their direct marketing and soliciting of FNS customers.  Possession and knowledge of FNS's contract prices gave Defendants CQ, CQ Transcriptions, and Morningside an illegal competitive advantage in the unfair soliciting of and bidding for FNS clients of fast turnaround verbatim transcripts of a variety of news events involving the federal government.

C.     **Cyber-theft of Online Transcript and Wire Service Databases**

55.     Since September 2004 to the present, Defendants CQ, CQ Transcriptions, and Morningside, through the infiltration of FNS by Ms. Pennell and others, obtained unauthorized access to FNS's online transcript and wire service databases, via an improper acquisition of a username and password.  Except for a 3-day publicly available free trial period from March 25-28, 2008, FNS never issued a username or password to Defendants CQ, CQ Transcriptions, and Morningside.  Server logs and other technical reports show that Morningside, CQ, and CQ

Transcriptions have a long history of improperly accessing and retrieving fast turnaround verbatim transcripts of news events involving the federal government from FNS proprietary databases. Defendants CQ and CQ Transcriptions under the direction of Defendants Merry, Carr-Davis, and O'Brien improperly accessed FNS databases on over 100 occasions and retrieved hundreds of proprietary FNS fast turnaround verbatim transcripts of news events involving the federal government. The news transcripts illegally retrieved by Defendants CQ and CQ Transcriptions under the direction of Defendants Merry, Carr-Davis, and O'Brien are products used by FNS to compete in the marketplace. The fast turnaround verbatim transcripts of a variety of news events involving the federal government were produced by FNS employees specifically trained in verbatim transcription, and require rapid and intensive editing by FNS prior to being made available for retrieval by clients. Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien), by misappropriating FNS news transcripts, are not only illegally free riding on misappropriated and stolen FNS work product, but threatening FNS's viability in the relevant antitrust markets by undermining its business. Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

56. According to FNS server logs, Defendants Morningside, CQ, and CQ Transcriptions under the direction of Defendants Merry, Carr-Davis, and O'Brien, illegally used passwords from Newsday, the Chicago Tribune, News Hour with Jim Lehrer, the Wall Street Journal, Copley News, and Asahi Shimbun to access FNS databases from computers owned by a Morningside affiliated company owned by Defendants Carr-Davis and O'Brien as well as Defendants CQ and CQ Transcriptions, located on CQ's premises. Review of FNS server logs demonstrates Defendants' (Morningside, CQ, and CQ Transcriptions) long history of improperly

accessing FNS proprietary information, records, and news transcripts.  Defendants Poynter

Institute and Times Publishing Company were aware of and approved these actions.

57.     This systematic theft of FNS transcripts did not originate from any actual

customer location.  Rather, the access originated from internet protocol ("IP") addresses owned

by Defendants CQ and CQ Transcriptions.  The IP addresses used to illegally access and

download FNS records are connected directly to Defendant CQ's computer network.  Indeed,

FNS server logs recorded access through these same IP addresses by computers labeled with CQ

identifiers using CQ addresses.

58.     For example, between November 3, 2004 and March 7, 2005, a user with an IP

address associated with Defendants CQ and CQ Transcriptions illegally logged onto the FNS

online transcript database on fourteen occasions and illegally retrieved 20 records, using the

account password for Sarah Mueller at <u>Newsday</u>.

59.     For example, on February 16, 2005, a user with an IP address associated with

Defendants CQ and CQ Transcriptions illegally logged onto the FNS online transcript database

on three occasions, using the account password for Michael Killian at the <u>Chicago Tribune</u>.

60.     For example, between June 7, 2005 and June 30, 2005, a user with an IP address

associated with E Media Millworks, an entity owned by Defendants Carr-Davis and O'Brien and

affiliated with Morningside, illegally logged onto the FNS online transcript database on twelve

occasions and illegally retrieved nine records, using the account password for Annette Miller at

<u>News Hour with Jim Lehrer</u>.

61.     For example, between February 16, 2006 and March 28, 2006, a user with an IP

address associated with Defendants CQ and CQ Transcriptions illegally logged onto the FNS

wire service database on nine occasions and illegally retrieved 31 records, using an account password for the Washington Bureau Account at the <u>Wall Street Journal</u>.

62.     For example, on January 26, 2007, a user with an IP address associated with Defendants CQ and CQ Transcriptions illegally logged onto the FNS online transcript database and illegally retrieved one record, using the account password for George Condon at <u>Copley News</u>.

63.     For example, on August 31, 2007, a user with an IP address associated with Defendants CQ and CQ Transcriptions illegally logged onto the FNS online transcript database and illegally retrieved two records, using the account password for Robert Yule at <u>Asahi Shimbun</u>.

64.     For example, from November 15, 2007 to March 31, 2009, a user with an IP address associated with Defendants CQ and CQ Transcriptions illegally logged onto the FNS online transcript database 34 times and retrieved 41 records, using the account password for Michael Lang at <u>Asahi Shimbun</u>.

   **D.      <u>CQ Misappropriation and Resale of FNS Trademarked, Time-Sensitive Transcripts</u>**

65.     FNS holds United States Trademark Registrations, including but not limited to the following marks for goods and services, and continuously used those marks in interstate commerce from the first use in commerce on the date shown in said registrations through and including the day of this Complaint:

| Mark | Goods/Services | Date of Registration | Registration Number |
|------|----------------|----------------------|---------------------|
| FEDERAL NEWS SERVICE | Information services, namely verbatim transcription of hearings, statements, briefings, statistics, and interviews, of and relating to government activities. | 3/26/2002 | 2,552,102 |
| FNS | Information services, namely verbatim transcription of hearings, statements, briefings, statistics, and interviews, of and relating to government activities. | 5/7/2002 | 2,566,914 |

66.     FNS had a multi-item contract with the Department of Defense Public Affairs Office.  The contract included a "Web Based News Service" subscription, valued at over $35,000 per year.  This subscription included Sunday news programs transcripts.  In March 2009, at least one of these transcripts was misappropriated by Defendants CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien.  In December 2008, the Department of Defense chose not to renew the "Web Based News Service" subscription from FNS, and instead signed a contract with Defendant CQ.

67.     In March 2009, a transcript appeared on the Department of Defense Website "Defense Link," of an interview on Fox News Sunday with Defense Secretary Robert Gates.  The transcript was attributed to, trademarked, and copyrighted by Defendant CQ; however, this transcript was a modified FNS transcript of the same interview.

68.     In comparing the misappropriated CQ transcript to the original FNS transcript, only a few differences exist:  indentation, one space instead of two after periods and colons, double dashes instead of single dashes, and lack of titles in identification.  **No** other differences exist in punctuation, paragraphing, or word use.  This lack of difference in punctuation, paragraphing or word use is extremely significant because there are always differences in word

choice, paragraphing and punctuation between FNS and CQ transcripts.  Most noticeably, was the use of the background identifier "(chuckles)," referring to chuckling or laughter during the transcribed event.  FNS uses "(chuckles)" as an identifier, but Defendants CQ, CQ Transcriptions, and Morningside do not typically use "(chuckles)" in their transcripts.  The operators of "Defense Link" stated that the source of this transcript was the CQ website.

69.     In telephone conversations between Defendants (CQ, CQ Transcriptions, and Morningside) and FNS, Defendant Carr-Davis, co-owner of Morningside, and board member of Defendant CQ Transcriptions, admitted that the transcript in question is in fact an FNS transcript improperly bearing a CQ copyright and trademark.  On information and belief, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) illegally misappropriated this particular transcript, altered and removed its copyright management information, and passed it off as a CQ transcript to its customers.  On information and belief, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr Davis, and O'Brien) illegally misappropriated other FNS transcripts, altered and removed copyright management information from those other news transcripts, and passed them off as CQ transcripts.

70.     Since September 2004 to the present, Defendants' conduct is a means for Defendants CQ, CQ Transcriptions, and Morningside to free ride on FNS's costly efforts to create, produce, edit, and transmit fast turnaround verbatim transcripts of a variety of news events involving the federal government.  FNS's subscription fees reflect FNS's transcription, production, and distribution costs.  Defendants' (CQ, CQ Transcriptions, and Morningside) stealing of FNS transcripts and reselling them as CQ transcripts allows Defendants (CQ, CQ

Transcriptions, and Morningside) to offer transcript subscriptions at a price far lower than FNS can offer for its services.

71.    Since September 2004 to the present, Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr Davis, and O'Brien) improper conduct usurped FNS's business relationships and opportunities, and will continue to do so unless stopped by this Court.  Defendants' (CQ, CQ Transcriptions, and Morningside) transcription services directly compete with FNS's own transcription services.  Both Defendants (CQ, CQ Transcriptions, and Morningside) and FNS compete for the same customer base. While some customers may use both services, most customers use only one and it is likely that those who use both in an effort to cut costs will only use one in the future.  Therefore, when a customer decides to subscribe to Defendants' (CQ and CQ Transcriptions) transcription services, the choice excludes FNS from selling transcription services to that customer.  If Defendants CQ, CQ Transcriptions, and Morningside are not enjoined from misappropriating FNS's efforts and investments in this manner, the acts of Defendants CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien will reduce the incentive to monitor government events and create, produce, generate, and deliver fast turnaround verbatim transcripts of a variety of news events involving the federal government that the existence and/or quality of the services that FNS provides to its customers, subscribers, and other licensees, and thereby to the public, will be substantially threatened.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

**E.    CQ Misrepresentations to Actual and Potential FNS Customers**

72.    Since September 2004 to the present, Defendant CQ misrepresented itself as the only provider of fast turnaround verbatim transcripts of a variety of news events involving the

federal government to government and armed forces customers.  There are multiple instances in which government agencies, including the Department of the Air Force and the Department of the Army, made "sole source" awards to CQ for a variety of CQ services, including transcripts. Most of these instances are for products identified as "CQ Services," including CQ Today, CQ Schedules, CQ Weekly, *etc*.  There are numerous instances of "sole source" awards being made for CQ.com, which provides access to many CQ services.  CQ continually told existing and potential customers that FNS would not be in business much longer, misrepresenting FNS's financial position even though CQ has no knowledge regarding FNS's financial position.  This behavior further exhibits CQ's anticompetitive intent, as well as CQ's intent to interfere with FNS's contracts and contractual relationships.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

   **F.**  **Bundling Sales of Transcripts With Other CQ Proprietary Products**

  73. Since September 2004 to the present, Defendant CQ's goal has been, and continues to be, to destroy FNS and to take away customers of FNS by bundling CQ's other products along with the fast turnaround verbatim transcripts of news events involving the federal government for free.  CQ has been willing to suffer financially in order to take business away from FNS.  CQ sells a wide variety of proprietary products where it has been recognized as a sole provider of those types of products.  CQ also sells transcript subscriptions to media outlets, distributors, government agencies, and foreign embassies.  In an effort to take business away from FNS, and harm FNS competitively, CQ bundles its numerous products for less than the normal cost of the other CQ services alone to entice FNS transcript customers to switch to CQ Transcriptions.  CQ accomplishes this by offering a bundle of its unique "CQ Services" along with its transcription services.  Sometimes, these other products and services are provided to the

consumer for free.  FNS does not have other products to bundle along with its transcription

services.  Hence, to match CQ's bundled offering, FNS must extend a discount on its

transcription services.  The bundling allows CQ to avoid competing with FNS directly on the

price and quality of the transcription services by imposing disproportionate burdens on FNS that

are wholly unrelated to FNS's product quality, which is frequently superior to CQ's transcripts.

Since this practice was initiated, FNS lost approximately 30 of its major media customers to CQ.

Defendants Poynter Institute and Times Publishing Company were aware of and approved these

actions.

        **F.**      **Predatory Hiring of FNS Employees to Disrupt FNS Operations**

        74.      Since September 2004 to the present, Defendants CQ, CQ Transcriptions, and

Morningside under the direction of Defendants Merry, Carr-Davis and O'Brien targeted FNS key

employees in a predatory hiring scheme.  In 2005, Defendant CQ hired three key FNS employees

in an effort to weaken and disrupt FNS's operations.  Defendant CQ hired two key editors of

FNS and a key employee of an FNS subcontractor responsible for providing FNS with audio of

Congressional hearings.  Scot Hoffman and Robert Hoenstine were long-time FNS editors with

many years of experience.  CQ hired them at nearly twice the salary FNS paid them.  CQ or its

affiliates guaranteed to provide for their legal defense if FNS brought any actions for violating

their non-compete or non-disclosure agreements.  By hiring two key FNS editors, CQ created

production problems for FNS.  Hiring the two FNS editors intentionally interfered with the

editors' contractual obligations not to compete with FNS.  Most significantly, while employed by

FNS, both editors hired by CQ had access to and knowledge of highly sensitive FNS client

account information, including user names and passwords needed to log into FNS databases.

The third person hired by CQ was Michael Eldridge, a long time sub-contractor of FNS

responsible for providing live audio feeds of Congressional hearings. The hiring of Mr. Eldridge caused some disruption to FNS's ability to efficiently provide live audio feeds. FNS depends on the experience and high quality service provided by its employees and subcontractors, as well as on its ability to safeguard its online transcript and wire service databases. The hiring of these FNS employees and sub-contractor demonstrates Defendant CQ's resolve to disrupt FNS's business and illegally injure it competitively in the relevant antitrust market. Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

## IV.   DEFENDANTS' PREDATORY CONDUCT HARMED FNS AND COMPETITION

75.    Since September 2004 to the present, Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful and anticompetitive conduct caused and continues to cause substantial harm to FNS and competition in the relevant antitrust markets. Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful conduct has a direct, substantial, and reasonably foreseeable effect on competition as the conduct enables them to obtain and maintain monopoly power, or alternatively, to create a dangerous probability of obtaining monopoly power in the markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government. Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) conduct injured both FNS and competition. Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

76.    Since September 2004 to the present, through an unlawful campaign of illegal activities including exclusive dealing agreements, conspiracy to restrain trade, unlawful corporate espionage, unlawful interference with FNS's business, unlawful misappropriation of

proprietary, confidential, and privileged FNS information, and unlawful intentional interference with FNS customer relationships, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) sought and seek to weaken FNS and force FNS to exit the relevant antitrust product and geographic markets, and prevent other firms from entering these markets, thus becoming the sole provider of fast turnaround verbatim transcripts of a variety of news events involving the federal government.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

77.     Since September 2004 to the present, through Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful agreement and conspiracy, working concertedly, with the assistance of Elizabeth Pennell and others, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) illegally gained access to FNS's proprietary and confidential business information and FNS's online databases of transcripts. Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

78.     Since September 2004 to the present, through Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful agreement, conspiracy, and pattern of illegal conduct, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Merry, Carr-Davis, and O'Brien) obtained time-sensitive FNS transcripts by illegally accessing the FNS online transcript database. Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) altered these transcripts, removed FNS copyright and trademark notices, and replaced them with CQ copyright and trademark notices.  Defendants (CQ, CQ

Transcriptions, and Morningside under the direction of Defendants Merry, Carr Davis, and

O'Brien) then sold these altered transcripts as part of their own subscription service.  Defendants

Poynter Institute and Times Publishing Company were aware of and approved these actions.

79.     Since September 2004 to the present, through Defendants' (CQ and CQ

Transcriptions under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful

bundling practices, Defendants gained and continue to have a supracompetitive advantage by

offering CQ news products together with fast turnaround verbatim transcripts of a variety of

news events involving the federal government with the goal of disrupting FNS's business and

taking FNS's customers.  Defendants Poynter Institute and Times Publishing Company were

aware of and approved these actions.

80.     Since September 2004 to the present, as a result of Defendants' (CQ, CQ

Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and

O'Brien) illegal conduct, FNS incurred substantial expenses to respond to Defendants' (CQ, CQ

Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and

O'Brien) industrial espionage and cyber-theft, as well as the poaching of FNS customers by

anticompetitive means.  Defendants' (CQ, CQ Transcriptions, and Morningside under the

direction of Defendants Merry, Carr-Davis, and O'Brien) conduct prevented and continues to

prevent FNS from fully competing in the marketplace, thereby injuring consumers and

competition in the markets for fast turnaround verbatim transcripts of a variety of news events

involving the federal government.  Defendants Poynter Institute and Times Publishing Company

were aware of and approved these actions.

81.     Since September 2004 to the present, through its monopolization or attempted

monopolization of the market for fast turnaround verbatim transcripts of a variety of news events

involving the federal government, Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) caused and continue to cause substantial harm to the business of FNS in the form of artificially constrained market share, lost profits, and increased costs of capital for security.  Additionally, that same conduct had, and continues to have, a direct, substantial, and reasonably foreseeable effect on FNS's ability to sell fast turnaround verbatim transcripts of a variety of news events involving the federal government to its customers.  The unlawful conduct injured and continues to injure competition, by, among other things, decreasing quality and increasing costs for fast turnaround verbatim transcripts of a variety of news events involving the federal government.  Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

## COUNT ONE

### "Hot News" Misappropriation

82.     FNS incorporates the allegations of paragraphs 21 through 81 as set forth in their entirety.

83.     FNS creates and edits fast turnaround verbatim transcripts of a variety of news events involving the federal government at substantial economic and professional costs.

84.     The value of the fast turnaround verbatim transcripts of a variety of news events involving the federal government created by FNS is that it is highly time-sensitive.

85.     Defendants' CQ, CQ Transcriptions, and Morningside, use of FNS' fast turnaround verbatim transcripts of a variety of news events involving the federal government constitutes free riding on FNS's significant and costly efforts to monitor, create, edit, produce and distribute fast turnaround verbatim transcripts of a variety of news events involving the

federal government.  Defendants Carr-Davis, O'Brien, Merry directed these actions and Poynter

Institute and Times Publishing Company were aware of and approved these actions.

86.     Defendants CQ, CQ Transcriptions, and Morningside Partners use and sell FNS

fast turnaround verbatim transcripts of a variety of news events involving the federal government

by subscription to the same customer base as FNS.  As a result, Defendants directly compete

with FNS.

87.     If Defendants CQ, CQ Transcriptions, and Morningside are allowed to continue to

free ride on FNS's significant and costly efforts to monitor, create, edit, produce and distribute

fast turnaround verbatim transcripts of a variety of news events involving the federal

government, the incentives for FNS to produce its transcripts will be substantially reduced, and

this reduction in turn jeopardizes the quality and/or existence of FNS's services.

88.     Defendants' (CQ, CQ Transcriptions, and Morningside) acts, as alleged above,

constitute "hot news" misappropriation under common law.

89.     Defendants CQ, CQ Transcriptions, and Morningside acted in bad faith, willfully,

maliciously, and without due regard for FNS's rights.

90.      As a direct and proximate result of Defendants' (CQ, CQ Transcriptions, and

Morningside) actions, FNS suffered and continues to suffer damages in the form of lost sales,

lost revenues, lost future income, lost investment capital, loss of potential sales value of the

corporation, loss of the value of its products and proprietary technology, and a decline in FNS's

business.

91.     Defendants' (CQ, CQ Transcriptions, and Morningside) acts of "hot news"

misappropriation cause, and unless restrained by this court, will continue to cause irreparable

injury to FNS, which is not fully compensable in monetary damages.  FNS is entitled to a

permanent injunction enjoining Defendants (CQ, CQ Transcriptions, and Morningside) from further acts of "hot news" misappropriation.

## COUNT TWO

### Violation of the D.C. Uniform Trade Secrets Act D.C. Code § 36-401

92.     FNS incorporates the allegations of paragraphs 21 through 91 as set forth in their entirety.

93.     Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien), acting through CQ employees and others unlawfully accessing FNS material and persuading FNS employees to do the same on their behalf, acquired FNS's trade secrets, in the form of its customer lists and proprietary work product, by improper means; wrongfully misappropriated for its own use FNS's trade secrets; and, wrongfully used and are wrongfully using FNS's trade secrets.  Defendants' misappropriation and conversion and use of FNS's trade secrets to harm FNS in the marketplace is in violation of the D.C. Uniform Trade Secrets Act; and, as a direct and proximate result thereof, FNS suffered damages in an amount not yet determined but to be established at trial.

94.     Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

## COUNT THREE

### Violation of the Digital Millennium Copyright Act 17 U.S.C. § 1202

95.     FNS incorporates the allegations of paragraphs 21 through 94 as set forth in their entirety.

96.     FNS places a copyright notice on all of its fast turnaround verbatim transcripts of a variety of news events involving the federal government.  The inclusion of FNS's name in all

of its news transcripts is "copyright management information," as defined in 17 U.S.C. §

1202(c).

97.     Defendants CQ, CQ Transcriptions, and Morningside, without authority of FNS

or the law, intentionally removed and/or altered and caused and induced others to remove and/or

alter copyright management information from FNS fast turnaround verbatim transcripts of a

variety of news events involving the federal government, and thereafter distributed said works,

having reasonable grounds to know that such acts induce, enable, facilitate or conceal an

infringement of copyright under Title 17, United States Code, in violation of 17 U.S.C. §

1202(b)(1) and (3).

98.     Defendants' (CQ, CQ Transcriptions, and Morningside) removal or alteration of

copyright management information from FNS fast turnaround verbatim transcripts of a variety of

news events involving the federal government, and subsequent distribution of the transcripts, as

alleged above, was and is willful and intentional, and was and is executed with full knowledge of

FNS's rights under the law, and in disregard of FNS's rights.

99.     Defendants Poynter Institute and Times Publishing were aware of and approved

these actions.  These actions were implemented under the direction of Defendants Merry, Carr-

Davis, and O'Brien.

100.    FNS is entitled to recover actual damages suffered as a result of the violation and

any profits of Defendants CQ, CQ Transcriptions, and Morningside attributable to the violation

and not taken into account in computing actual damages, or, at FNS's election, statutory

damages pursuant to 17 U.S.C. § 1203(c).

101.    FNS is entitled to recover costs and attorney's fees from Defendants pursuant to

17 U.S.C. § 1203(b)(3) and (5).

102.    Defendants' (CQ, CQ Transcriptions, and Morningside) violations of 17 U.S.C. §

1202(b)(1) and (3) caused, and, unless restrained by this Court, continue to cause, irreparable

injury to FNS not fully compensable in monetary damages.  Pursuant to 17 U.S.C. § 1203(b)(1),

FNS is entitled to a permanent injunction enjoining Defendants from further such violations.

### COUNT FOUR

**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C)**

103.    FNS incorporates the allegations of paragraphs 21 through 102 as set forth in their

entirety.

104.    Defendants Merry, Carr-Davis, and O'Brien, on behalf of CQ, CQ Transcriptions,

and Morningside, instructed, encouraged, induced, and persuaded Ms. Pennell, CQ employees,

and other individuals, who, acting as agents and instrumentalities of Defendants CQ, CQ

Transcriptions, and Morningside, intentionally accessed FNS computers and online databases

without authorization.

105.    Defendants Poynter Institute and Times Publishing Company were aware of and

approved these actions.

106.    Acting upon instructions, encouragement, inducement, and persuasion of and by

Defendants CQ, CQ Transcriptions, and Morningside, Ms. Pennell, CQ employees, and other

individuals, who, acting as agents and instrumentalities of Defendants CQ, CQ Transcriptions,

and Morningside, intentionally accessed an FNS computer used for interstate commerce or

communication, without authorization or by exceeding authorized access to such a computer, and

by obtaining information from such a protected computer.

107.     Acting upon the instructions, encouragement, inducement, and persuasion of and

by Defendants CQ, CQ Transcriptions, and Morningside, Ms. Pennell, CQ employees, and other

individuals, who, acting as agents and instrumentalities of Defendants CQ, CQ Transcriptions, and Morningside, obtained information, including FNS's proprietary, confidential and privileged information, from a protected FNS computer.

108.    As a direct and proximate result of Defendants' (CQ, CQ Transcriptions, and Morningside) actions, Defendants (CQ, CQ Transcriptions, and Morningside) intentionally accessed FNS computers and said access exceeded their authority, and Defendants (CQ, CQ Transcriptions, and Morningside) obtained information, including FNS's proprietary, confidential and privileged information, from a protected FNS computer.

109.    Such conduct involved interstate or foreign communication.

110.    FNS suffered damage or loss as a result of Defendants' (CQ, CQ Transcriptions, and Morningside) violation of the Computer Fraud and Abuse Act ("CFAA"), which caused loss to one or more persons during a one year period aggregating at least $5,000 in value.

111.    As a direct and foreseeable result of Defendants' (CQ, CQ Transcriptions, and Morningside) conduct, FNS has been injured and suffered damages in an amount to be determined at trial.

## **COUNT FIVE**

### **Violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030(a)(4)**

112.    FNS incorporates the allegations of paragraphs 21 through 111 as set forth in their entirety.

113.    Acting upon instructions, encouragement, inducement, and persuasion of and by Defendants Merry, Carr-Davis, and O'Brien on behalf of CQ, CQ Transcriptions, and Morningside Partners, Ms. Pennell, CQ employees, and other individuals, who, acting as agents and instrumentalities of Defendants (CQ, CQ Transcriptions, and Morningside), knowingly and

with intent to defraud, accessed protected FNS computers without authorization or exceeded

authorized access, and by means of such conduct furthered the intended fraud and obtained one

or more things of value, including, but not limited transcripts produced by FNS.

114.   Defendants Poynter Institute and Times Publishing Company were aware of and

approved these actions.

115.   Defendants (CQ, CQ Transcriptions, and Morningside) obtained value, including

FNS's proprietary, confidential and privileged information, from a protected FNS computer,

which exceeds the sum of $5,000.

116.   FNS suffered damage or loss as a result of Defendants' (CQ, CQ Transcriptions,

and Morningside) violation of the CFAA, which caused loss to one or more persons during a one

year period aggregating at least $5,000 in value.

117.   As a direct and foreseeable result of Defendants' (CQ, CQ Transcriptions, and

Morningside) conduct, FNS has been injured and suffered damages in an amount to be

determined at trial.

## COUNT SIX

### Violation of Computer Fraud and Abuse Act 18 U.S.C. § 1030(a)(5)(B)

118.   FNS incorporates the allegations of paragraphs 21 through 117 as set forth in their

entirety.

119.   Defendants Merry, Carr-Davis, and O'Brien, on behalf of CQ, CQ Transcriptions,

and Morningside, intentionally accessed a protected FNS computer without authorization.

120.   Defendants Poynter Institute and Times Publishing Company were aware of and

approved these actions.

121.     The result of such conduct recklessly caused damage, including the disclosure of FNS's proprietary, confidential and privileged information.

122.     FNS suffered damage or loss as a result of Defendants' (CQ, CQ Transcriptions, and Morningside) violation of the CFAA, which caused loss to one or more persons during a one year period aggregating at least $5,000 in value.

123.     As a direct and foreseeable result of Defendants' (CQ, CQ Transcriptions, and Morningside) conduct, FNS has been injured and suffered damages in an amount to be determined at trial.

## COUNT SEVEN

### Violation of Computer Fraud and Abuse Act 18 U.S.C. § 1030(a)(5)(A)(iii)

124.     FNS incorporates the allegations of paragraphs 21 through 123 as set forth in their entirety.

125.     Defendants Merry, Carr-Davis, and O'Brien, acting on behalf of CQ, CQ Transcriptions, and Morningside, intentionally accessed a protected FNS computer without authorization.

126.     Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

127.     The result of such conduct caused damage.

128.     FNS suffered damage or loss as a result of Defendants' (CQ, CQ Transcriptions, and Morningside) violation of the CFAA, which caused loss to one or more persons during a one year period aggregating at least $5,000 in value.

129.    As a direct and foreseeable result of Defendants' (CQ, CQ Transcriptions, and Morningside) conduct, FNS has been injured and suffered damages in an amount to be determined at trial.

## COUNT EIGHT

### Conspiracy to Unreasonably Restrain Trade

130.    FNS incorporates the allegations of paragraphs 21 through 129 as set forth in their entirety.

131.    The production and the sale of fast turnaround verbatim transcripts of a variety of news events involving the federal government are relevant antitrust product markets within the meaning of the antitrust laws.

132.    The relevant geographic market is the United States.

133.    Defendants Merry, Carr-Davis, and O'Brien, acting on behalf of CQ, CQ Transcriptions, and Morningside, conspired to engage in anticompetitive, exclusionary, and predatory conduct described above.  These actions, taken in the aggregate, were designed to unreasonably restrain trade in the markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government by driving FNS out of business.

134.    Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

135.    The conspiracy among Defendants (CQ, CQ Transcriptions, and Morningside) constitutes an illegal conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act under the *per se* or rule of reason standard of analysis.

136.    As a direct and proximate result of Defendants' (CQ, CQ Transcriptions, and Morningside) unlawful conduct, competition in the relevant antitrust markets have been harmed

through reduced competition, quality, innovation, and consumer choice, to the detriment of consumers.

137.    As a direct and proximate result of Defendants' (CQ, CQ Transcriptions, and Morningside) unlawful conduct, FNS has been injured in business or property in an amount not yet determined but to be established at trial.  Such damages include, but are not limited to:  lost profits; loss of customers and potential customers; loss of goodwill; and, attorney's fees and other legal expenses.

138.    Unless Defendants' (CQ, CQ Transcriptions, and Morningside) unlawful conduct is enjoined, Defendants' anticompetitive conduct will continue and FNS will suffer immediate and irreparable injury for which FNS will lack any remedies at law.  FNS believes that Defendants (CQ, CQ Transcriptions, and Morningside) will continue to act as alleged herein unless the Court enjoins such actions.  These acts will injure and impair competition by reducing the incentive to monitor government events and create, produce, generate, and deliver fast turnaround verbatim transcripts of a variety of news events involving the federal government.

139.    Defendants' (CQ, CQ Transcriptions, and Morningside) unlawful conduct injured and continues to injure competition, by, among other things, decreasing quality and increasing costs for fast turnaround verbatim transcripts of a variety of news events involving the federal government.

## COUNT NINE

### Conspiracy to Monopolize

140.    FNS incorporates the allegations of paragraphs 21 through 139 as set forth in their entirety.

141.     The production and the sale of fast turnaround verbatim transcripts of a variety of news events involving the federal government are relevant antitrust product markets within the meaning of the antitrust laws.

142.     The relevant geographic market is the United States.

143.     Defendants (CQ, CQ Transcriptions, and Morningside) conspired to engage in anticompetitive, exclusionary and predatory conduct described above, to obtain and maintain monopoly power in the markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government.

144.     Defendants Merry, Carr-Davis, and O'Brien, and acting on behalf of CQ, CQ Transcriptions and Morningside, engaged in conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant antitrust markets, to stifle competition and to eliminate consumer choice through unlawfully exclusionary behavior designed to keep FNS weak, undersized, and unable to achieve efficient scale of operation needed to be a viable substitute for Defendants (CQ, CQ Transcriptions, and Morningside) with respect to customers, or to an essential portion of the relevant antitrust markets.  Defendants (CQ, CQ Transcriptions, and Morningside) engaged in this conduct with the intent to maintain its monopoly in the relevant antitrust markets.

145.     Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

146.     Defendants' (CQ, CQ Transcriptions, and Morningside) acts described above constitute overt acts in furtherance of the conspiracy.

147.    There is no legitimate, justifiable business reason for Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) conduct.

148.    Any justifications provided by Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) for their conduct are merely pretextual.

149.    The conspiracy among Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) constitutes an illegal conspiracy or other unreasonable restraint of trade in violation of Sections 1 and 2 of the Sherman Act.

150.    As a direct and proximate result of Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful conduct, competition in the relevant antitrust markets has been harmed through reduced competition, quality, innovation, and consumer choice, to the detriment of consumers.

## COUNT TEN

**Monopolization and Attempted Monopolization
In Violation of Section 2 of the Sherman Act**

151.    FNS incorporates the allegations of paragraphs 21 through 150 as set forth in their entirety.

152.    The production and the sale of fast turnaround verbatim transcripts of a variety of news events involving the federal government are relevant antitrust product markets within the meaning of the antitrust laws.

153.    The relevant geographic market is the United States.

47

154.    Defendants CQ, CQ Transcriptions, and Morningside possess monopoly power in the relevant antitrust markets, maintaining a dominant position in a two firm market.

155.    Substantial barriers to entry and expansion exist in the relevant antitrust markets.

156.    Defendants CQ, CQ Transcriptions, and Morningside have the power to control prices and exclude competition.

157.    Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) engaged in conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant antitrust markets, to stifle competition and to eliminate consumer choice through unlawfully exclusionary behavior designed to keep FNS weak, undersized, and unable to achieve efficient scale of operation needed to be a viable substitute for Defendants with respect to customers, or to an essential portion of the relevant antitrust markets.  Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) engaged in this conduct with the intent to maintain its monopoly in the relevant antitrust markets in violation of Section 2 of the Sherman Act.

158.    Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

159.    There is no legitimate business justification for Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) conduct.

160.    Alternatively, by Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) illegal conduct, they attempted to monopolize the relevant antitrust markets, with the specific intent to do so and there is a

dangerous probability that Defendants will succeed in obtaining monopoly power in violation of Section 2 of the Sherman Act.

161.    Defendants CQ, CQ Transcriptions, and Morningside are engaged in interstate and foreign commerce, and the majority of their sales occur in such commerce.

162.    As a direct and proximate result of Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful conduct, competition in the relevant antitrust markets has been harmed through reduced competition, quality, innovation, and consumer choice, to the detriment of consumers.

163.    As a direct and proximate result of Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful conduct, FNS has been injured in business or property in an amount not yet determined but to be established at trial.  Such damages include, but are not limited to:  lost profits; loss of customers and potential customers; loss of goodwill; and, attorney's fees and other legal expenses.

164.    Unless Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful conduct is enjoined, Defendants' anticompetitive conduct will continue and FNS will suffer immediate and irreparable injury for which FNS will lack any remedies at law.  FNS believes that Defendants will continue to act as alleged herein unless the Court enjoins such actions.

165.    Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) unlawful conduct injured and continues to injure competition, by, among other things, decreasing quality and increasing costs for fast turnaround verbatim transcripts of a variety of news events involving the federal government.

## COUNT ELEVEN

### Violation of D.C. Code § 28-4503

166.   FNS incorporates the allegations of paragraphs 21 through 165 as set forth in their entirety.

167.   This Count is brought under D.C. Code § 28-4503 for injunctive relief and treble damages.

168.   The production and the sale of fast turnaround verbatim transcripts of a variety of news events involving the federal government are relevant antitrust product markets within the meaning of the antitrust laws.

169.   The relevant geographic market is the United States.

170.   Defendants CQ, CQ Transcriptions, and Morningside possess monopoly power in the relevant antitrust markets, maintaining a dominant position in a two firm market.

171.   Substantial barriers to entry and expansion exist in the relevant antitrust market.

172.   Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

173.   Defendants (CQ, CQ Transcriptions, and Morningside) have the power to control prices and exclude competition.

174.   Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) engaged in conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant antitrust markets, to stifle competition and to eliminate consumer choice through unlawfully exclusionary behavior designed to keep FNS weak, undersized, and unable to achieve efficient scale of operation

needed to be a viable substitute for Defendants.  Defendants have done this with the intent to maintain its monopoly in the relevant antitrust markets in violation of D.C. Code § 28-4503.

175.    There is no legitimate business justification for Defendants' conduct.

176.    Alternatively, by Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) illegal conduct, they attempted to monopolize the relevant antitrust markets, with the specific intent to do so and there is a dangerous probability that Defendants will succeed in obtaining monopoly power in violation of D.C. Code § 28-4503.

177.    The foregoing acts and practices and the continuing course of Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) anticompetitive conduct harmed and continue to harm FNS and competition in the District of Columbia and elsewhere.

178.    Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) anticompetitive and exclusionary conduct directly and proximately caused injury to FNS's business and property as set forth above.  FNS's injury is of the type this law intends to prohibit.  Unless the activities set forth above are enjoined, FNS will suffer immediate and irreparable injury for which FNS will lack any remedy at law.  FNS believes that Defendants will continue to do the acts alleged herein unless the Court enjoins Defendants.

## COUNT TWELVE

### Tortious Interference with Business Relationships

179.    FNS incorporates the allegations of paragraphs 21 through 178 as set forth in their entirety.

180.    Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) conduct as alleged herein gives rise to common law liability for intentional interference with contractual, business, and economic relations.

181.    At all relevant times, FNS held legally enforceable contractual, business, or economic relationships with third parties, both customers and employees.

182.    At all relevant times, Defendants Merry, Carr Davis, and O'Brien, acting on behalf of CQ, CQ Transcriptions, and Morningside, knew of FNS's valid and legally enforceable contractual, business, and economic relationships with third parties and that unlawful interference was certain or substantially certain to occur as a result of its tortious and anticompetitive conduct.

183.    Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

184.    Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) deliberate and primary purpose in engaging in the foregoing intentional acts and practices was to cause a breach or disruption of FNS's contractual, business, and economic relations with third parties.

185.    The foregoing relationships provided economic and other benefits to FNS but for Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) tortious and anticompetitive conduct.

186.    The foregoing acts and practices, and the continuing course of Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) tortious and anticompetitive conduct, deliberately and directly resulted in actual breaches and disruptions of FNS's contractual, business, and economic relations with third

parties, which directly and proximately caused FNS to suffer injury and damages to its business and property, as set forth above.

187.    Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) committed these tortious acts with deliberate and actual malice, ill will, and specific knowledge that its actions constituted an outrageous, willful, and wanton disregard of FNS's legal rights and expectations.

188.    Unless the activities complained of are enjoined, FNS will suffer immediate and irreparable injury for which FNS is without an adequate remedy at law.

## COUNT THIRTEEN

### Tortious Interference with Prospective Economic Advantage

189.    FNS incorporates the allegations of paragraphs 21 through 188 as set forth in their entirety.

190.    Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) conduct as alleged herein gives rise to common law liability for intentional interference with prospective economic advantage.

191.    At all relevant times, FNS held legitimate expectations of legally enforceable contractual, business, or economic relationships with third parties.

192.    At all relevant times, FNS possessed a reasonable probability of entering into legally enforceable contractual, business, or economic relationships with third parties but for Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) tortious and anticompetitive conduct.

193.    At all relevant times, Defendants Merry, Carr Davis, and O'Brien, acting on behalf of CQ, CQ Transcriptions, and Morningside, knew of FNS's prospective contractual,

business, and economic relationships with third parties and that unlawful interference was certain or substantially certain to occur as a result of its tortious and anticompetitive conduct.

194.    Defendants Poynter Institute and Times Publishing Company were aware of and approved these actions.

195.    Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) deliberate and primary purpose in engaging in the foregoing intentional acts and practices was to disrupt and thwart FNS's prospective contractual, business, and economic relations with third parties.

196.    The foregoing relationships would have provided economic and other benefits to FNS but for Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) tortious and anticompetitive conduct.

197.    The foregoing acts and practices, and Defendants' (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) continuing course of tortious and anticompetitive conduct violate statutes, regulations, common law, and other determinable legal standards, and were and are wrongful independent of their impact on FNS's prospects for economic advantage.

198.    Defendants (CQ, CQ Transcriptions, and Morningside under the direction of Defendants Merry, Carr-Davis, and O'Brien) committed these tortious acts with deliberate and actual malice, ill will, and specific knowledge that its actions constituted an outrageous, willful, and wanton disregard of FNS's legal rights and expectations.

199.    Unless the activities complained of are enjoined, FNS will suffer immediate and irreparable injury for which FNS is without an adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff FNS prays this Court enter judgment:

a.      Ordering injunctions against Defendants, preventing any further use of FNS intellectual property, electronic documents, communications, proprietary information, or business materials, and further ordering Defendants expunge all such information from their electronic and paper records;

b.      Permanently restraining Defendants from (i) misappropriating FNS "hot news" content; (ii) removing or altering FNS's copyright management information from FNS products; and (iii) committing further acts of unfair competition against FNS.

c.      Awarding, pursuant to the D.C. Uniform Trade Secrets Act, D.C. Code § 36-401, FNS actual damages and costs in an amount to be determined at trial.

d.      Awarding, pursuant to 17 U.S.C. § 1203 *et seq.*, damages in an amount to be determined at trial, and appropriate injunctive relief;

e.      Awarding, pursuant to 18 U.S.C. § 1030, FNS compensatory damages in an amount to be determined at trial;

f.      Awarding a judgment in favor of FNS declaring that Defendants attempted to monopolize and monopolized the relevant antitrust markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

g.      Awarding a judgment in favor of FNS declaring that Defendants unlawfully agreed or conspired to restrain trade in the relevant antitrust markets in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2;

h.      Awarding a judgment permanently enjoining Defendants, their respective officers, agents, servants, directors, and employees, and all persons in active concert or participation with

each, from monopolizing and attempting to monopolize the relevant antitrust markets under Section 16 of the Clayton Act, 15 U.S.C. § 4(a), 26;

      i.      Awarding FNS actual and compensatory damages, including but not limited to lost profits and attorney's fees, trebled as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15(a), plus interest;

      j.      Awarding a judgment in favor of FNS declaring that Defendants violated D.C. Code § 28-4503, awarding FNS restitution and damages insofar as appropriate, trebled as provided by law, including costs and attorney's fees, and permanently enjoining Defendants from violations of that section;

      k.      Awarding a judgment in favor of FNS declaring that Defendants tortiously interfered with FNS's contractual relations, and permanently enjoining Defendants from doing so;

      l.      Awarding a judgment in favor of FNS declaring that Defendants tortiously interfered with FNS's prospective economic advantage, and permanently enjoining Defendants from doing so;

      m.      For restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by Defendants through the acts complained of here;

      n.      Awarding FNS punitive and exemplary damages as the law shall permit or the jury shall find, plus interest;

      o.      Awarding FNS attorney's fees and costs incurred in this action, with interest; and,

      p.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

FNS hereby requests a trial by jury on all issues so triable.


Respectfully submitted,

FEDERAL NEWS SERVICE, INC.


Robert W. Doyle, Jr. ( Bar No. 285429)
Andre P. Barlow (Bar No. 465683)
Camelia C. Mazard (Bar No. 461778)
**DOYLE, BARLOW & MAZARD PLLC**
1350 I Street, N.W.  Suite 850
Washington, D.C.  20005
T: (202) 589-1834
F: (202) 589-1819
rdoyle@dbmlawgroup.com
abarlow@dbmlawgroup.com
cmazard@dbmlawgroup.com


Dated:  October 15, 2009.

## CERTIFICATE OF SERVICE

I, Robert W. Doyle, Jr. , hereby certify that on October 15, 2009, I served the foregoing Amended Complaint of Plaintiff Federal News Service on the counsel listed in the below service list via U.S. Postal Service first class mail, and electronic mail.

Robert W. Doyle, Jr.

Drew S. Marrocco
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC  20005
dmarrocco@sonnenschein.com

Robert Andalman
Loeb & Loeb LLP
321 N. Clark Street
Suite 2300
Chicago, IL  60654
randalman@loeb.com

*Counsel for Defendants Morningside Partners LLP, Stephen Carr-Davis, and Anthony O'Brien*

Joseph S. Hall
Mark C. Hansen
Michael K. Kellogg
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, NW
Washington, DC  20036
jhall@khhte.com
mhansen@khhte.com
mkellogg@khhte.com

*Counsel for Defendants Poynter Institute for Media Studies, Times Publishing Company, Congressional Quarterly, Inc., CQ Transcriptions, Inc., and Robert Merry*