**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                                    )
**FEDERAL NEWS SERVICE, INC.**                )
     **Plaintiff,**                                              )
                                                                    )
                                                                    )    **Case No. 1:09-cv-01226-RMU**
**vs.**                                                           )
                                                                    )
                                                                    )
**POYNTER INSTITUTE FOR MEDIA**             )
**STUDIES,** *et al.*                                         )
     **Defendants.**                                         )
                                                                    )
_____)

**FEDERAL NEWS SERVICE'S CONSOLIDATED OPPOSITION TO MOTIONS TO
DISMISS ON BEHALF OF POYNTER INSTITUTE FOR MEDIA STUDIES, TIMES
PUBLISHING COMPANY, CONGRESSIONAL QUARTERLY, INC., CQ
TRANSCRIPTIONS, INC., MORNINGSIDE PARTNERS, LLC, STEPHEN CARR
DAVIS, ANTHONY O'BRIEN AND ROBERT MERRY**

       Plaintiff, Federal News Service ("FNS"), respectfully submits this Consolidated

Opposition to Defendants' Motions to Dismiss on behalf of Poynter Institute for Media

Studies ("Poynter"), Times Publishing Company ("Times Publishing"), Congressional

Quarterly, Inc. ("CQ"), CQ Transcriptions, Inc. ("CQ Transcriptions"), Morningside

Partners, LLC ("Morningside"), Stephen Carr Davis ("Carr Davis"), Anthony O'Brien

("O'Brien"), and Robert Merry ("Merry") (collectively referred to as "Defendants").[1]

       Through a series of detailed fact based allegations set forth in 57 pages and 199

paragraphs, FNS properly alleged all Defendants participated in an anticompetitive

---

[1] There are three Motions to Dismiss.  First, Poynter, Times Publishing, and Merry filed a Motion to Dismiss for Lack of Personal Jurisdiction referred to as "Poynter Motion to Dismiss".  Morningside, O'Brien, and Carr Davis filed a Motion to Dismiss referred to as "Morningside Motion to Dismiss". Poynter, Times Publishing, CQ, CQ Transcriptions, and Merry filed a Motion to Dismiss referred to as "CQ's Motion to Dismiss".  Morningside Defendants state in their Motion to Dismiss that they adopt the arguments in Poynter and CQ's Motions to Dismiss.

conspiracy to monopolize or attempt to monopolize the markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government. Defendants' Motions to Dismiss should be denied and this litigation should proceed.

## I.     INTRODUCTION

Defendants' Motions to Dismiss contain numerous bald, unsupported assertions regarding the lack of specific allegations set forth in FNS's Amended Complaint that are simply disingenuous. Their assertions are exaggerated and untrue. Defendants argue that the allegations in the Amended Complaint lack specificity and detail. In fact, the Amended Complaint sets forth elaborate factual detail with great specificity. Indeed, all the Defendants are well aware of the anticompetitive conduct alleged in the original complaint and in the Amended Complaint because the conduct is well known by each of them. The allegations should surprise no one, least of all the named Defendants in this matter, who have been conspiring to destroy FNS since September 2004.

FNS sufficiently alleged numerous facts consistent with an anticompetitive scheme to drive FNS out of business. The conspiracy among Defendants started as early as September 2004 when Merry of CQ, Carr Davis and O'Brien, owners of Morningside, each agreed to a plan to eliminate competition by driving FNS out of business. *See* Amended Complaint ¶¶ 25-26. The plan was to go after all FNS accounts regardless of costs to destroy FNS and monopolize the production and sales of fast turnaround verbatim transcripts of a variety of news events involving the federal government. *Id.* The Amended Complaint sets forth facts alleging that "Carr Davis agreed to head the effort to destroy FNS along with the help of the CQ sales team." *Id.* All Defendants, including CQ, CQ Transcriptions, and Morningside under the direction of Merry, Carr Davis, and O'Brien, pursued a relentless

campaign to drive FNS out of business by engaging in corporate espionage and corporate theft on a grand scale. *See* Amended Complaint ¶¶ 25-26. Employees and/or agents of Defendants CQ, CQ Transcriptions and Morningside engaged in systematic, illegal access to and taking from FNS's computers and online databases. *See* Amended Complaint ¶¶ 25, 55-64. Through this unlawful scheme, Defendants stole confidential materials and proprietary products with copyright and trademark notices on them. *See* Amended Complaint ¶¶ 25, 55-64. Defendants gained repeated and unauthorized access, in many cases by use of pretextual customer login credentials, to FNS's proprietary, password-protected customer website. *See* Amended Complaint ¶¶ 25, 55-64. Taken as a whole, these allegations set forth an anticompetitive conspiracy to monopolize the relevant markets.

Defendants make five overarching arguments in support of their Motions to Dismiss. **First**, Defendants claim that much of the alleged conduct occurred outside the statute of limitations. However, the Amended Complaint makes it abundantly clear that much of this illegal conduct occurred within the statute of limitations as the conduct continued through 2009. *See* Amended Complaint ¶¶ 26, 28, 44-46, 50, 55, 64, 66, 70-80. Under the continuing tort and equitable tolling doctrines, it is inappropriate to dismiss in whole or in part of any of the causes of action for being time barred.

**Second**, Defendants' Motions to Dismiss contend that most of the Counts in the Amended Complaint should be dismissed because the Amended Complaint "relies on the barest of allegations" … "rendering them implausible". CQ's Motion to Dismiss, p. 2. These bald assertions are deceitful given the amount of detail in the factual allegations set forth in the Amended Complaint that is approximately 57 pages in length including 199 detailed paragraphs. The Amended Complaint properly alleges valid claims under common

law for misappropriation of "hot news" and tortious interference, under the D.C. Uniform Trade Secrets Act, the Computer Fraud & Abuse Act, Digital Millennium Act, and the antitrust laws.

**Third**, Defendants' Motions to Dismiss contend that the Amended Complaint does not contain sufficient allegations of competitive harm. This contention is absolutely false. The Amended Complaint contains specific allegations relating to anticompetitive harm. *See* Amended Complaint ¶¶ 42, 44-45, 48, 50-51, 57, 63, 65, 74-76, 80-81 (Defendants "conduct prevented and continues to prevent FNS from fully competing in the marketplace, thereby injuring consumers and competition" and Defendants "unlawful conduct injured and continues to injure competition, by, among other things, decreasing quality and increasing costs.").

**Fourth**, the Morningside Motion to Dismiss contends that they are an afterthought and should not be parties to this litigation. Undoubtedly, the Amended Complaint makes clear that the Morningside Defendants, including O'Brien and Carr Davis, were directly involved in the plan to destroy FNS's business and participated in the collusive meeting in September 2004 that launched the anticompetitive scheme. *See* Amended Complaint ¶ 25.

**Fifth**, the Poynter Motion to Dismiss contends that this Court does not have personal jurisdiction over non-resident Defendants. Indisputably, this Court has personal jurisdiction over Poynter, Times Publishing, Merry, and other non-resident Defendants under the D.C. long arm statue.

In summary, Defendants' Motions to Dismiss should be rejected because FNS properly alleged enough facts to state a claim to relief that is plausible on its face for all of the Counts set forth in the Amended Complaint.

## II.      PROCEDURAL HISTORY

On July 2, 2009, FNS filed a 20 Count Complaint against Poynter, Times Publishing, CQ, CQ Transcripts, Morningside, Merry, O'Brien, and Carr Davis.  On August 28, 2009, Defendants filed Motions to Dismiss.  Since the filing of the Complaint, Defendants took steps to prematurely end this litigation through their Motions to Dismiss and through the bankruptcy proceedings in the U.S. Bankruptcy Court in the Western District of Arkansas' Hot Springs Division (USBC 6:04-bk-77590- m Chapter11, Cheryl Reagan's Estate).  Defendant CQ's filings in the U.S. Bankruptcy Court demonstrate that Defendants continue to be interested in eliminating FNS and disrupting FNS's business.

As background, TIG Capital Inc. purchased FNS out of bankruptcy in March 2009 and took managerial control of FNS at that time.  On June 26, 2009, the Bankruptcy Court entered an order approving the sale to TIG Capital.  On August 14, 2009, Defendant CQ filed an opposition to the bankruptcy trustee's motion to extend the time for TIG to pay for FNS.  On August 19, 2009, the Bankruptcy Court held a hearing on the motion to extend time for payment of FNS.  At the hearing, Defendant CQ was represented by Loeb & Loeb, the same law firm that represents Morningside in this lawsuit.  On September 3, 2009, Defendant CQ filed a motion to vacate the order granting the trustee's motion to confirm the sales price of FNS and to set aside the sale of FNS.  On September 21, 2009, the bankruptcy court vacated the sale of FNS to TIG and ordered the trustee to seek new sealed bids for FNS.  The Bankruptcy Court ordered that Frederick S. Wetzel, III., the bankruptcy trustee of Ms. Reagan's estate, take and exercise complete managerial control over all aspects of FNS.  Per the Bankruptcy Court's Order, Mr. Wetzel is "entitled to the right, title, interest, possession, control, and management of

5

FNS".  Exhibit 1 at par. 6.  Since September 21, 2009, Mr. Wetzel held full managerial control over all business decisions of FNS.  After Mr. Wetzel took control over FNS, FNS amended its complaint to clarify the allegations, provide additional information relating to Defendants' continued participation in the bankruptcy proceedings, describe in more detail Defendants' efforts to further disadvantage FNS, and show Defendants' continuing pursuit to acquire or destroy FNS.

## III.   ARGUMENT

### A.   Legal Standard for a Motion to Dismiss

A complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003)(citing Fed. R. Civ. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 78 S.Ct. 99 (1957)).  "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues."  *Conle*y, 355 U.S. at 47-48, 78 S.Ct. 99 (internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of his *prima facie* case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14, 122 S.Ct. 992 (2002),  or "plead law or match facts to every element of a legal theory,"  *Krieger v. Fadely*, 211 F.3d 134, 135 (D.C. Cir. 2000).  The plaintiff must allege a "plausible entitlement to relief," by setting forth facts consistent with the allegations.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559, 127 S.Ct. 1955 (2007).  While these facts must "possess enough heft to 'sho[w] that the pleader is entitled to relief,'" a complaint "does not need detailed factual allegations."  *Id.*

at 545, 555.  In fact, Justice Souter articulated succinctly the pleading standard required under *Twombly*: ***"we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."***  *Id.* at 570 (emphasis added).

The Supreme Court in *Twombly* reiterated that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A court must not dismiss a complaint for failure to state a claim unless the plaintiff failed to plead "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. 570.  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiffs' grounds for entitlement to relief - including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' "  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)(quoting *Twombly*, 127 S.Ct. at 1964-65).  "In resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations - including mixed questions of law and fact - as true and draw all reasonable inferences therefrom in the plaintiff's favor."  *Shirk v. Garrow*, 505 F. Supp. 2d 169, 172 (D.D.C. 2007)(Urbina, J.)(citing *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003).

When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts presume that all well-pled allegations are true, resolving all doubts and inferences in the plaintiff's favor, and viewing the pleading in the light most favorable to the non-moving party.  *Erickson v. Pardus,* 551 U.S. 89 (2007); *In re Rail Freight Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 31-32 (D.D.C. 2008).  Claims shall not be dismissed simply

because someone may not believe the allegations or feels that recovery is remote or unlikely. *See Twombly*, 127 S. Ct. at 1965 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."; *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."). Regardless of whether Defendants Poynter, Times Publishing, CQ, CQ Transcriptions, Morningside, Merry, O'Brien, and Carr-Davis agree with the allegations against them, the facts are that all of the named Defendants participated in an anticompetitive scheme and conspiracy designed to weaken and ultimately drive FNS out of business. *See* Amended Complaint ¶ 25, 26. FNS properly alleged that Defendants Poynter, Times Publishing, CQ, CQ Transcriptions, Morningside, Merry, O'Brien, and Carr Davis were involved in the illegal conspiracy that caused FNS harm and damages, and adversely impacted competition in the relevant markets. *See* Amended Complaint ¶¶ 25-28, 42-81.

**B.     This Court Has Jurisdiction Over Non-Resident Defendants Poynter, Times Publishing, Morningside, Merry, O'Brien, and Carr Davis**

Defendants Poynter and Times Publishing participated in a conspiracy designed to drive FNS out of the relevant markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government so that their subsidiary corporations, Defendants CQ and CQ Transcriptions could monopolize the relevant markets in violation of § 2 of the Sherman Act. *See* Amended Complaint ¶¶ 25-28. FNS properly alleged that "Poynter and Times Publishing knew and approved of these actions" in multiple places throughout its Amended Complaint. *See* Amended Complaint at ¶¶ 18, 21-28, 42, 44, 55-56, 71-81, 85, 94, 99, 105, 114, 120, 126, 134, 145, 158, 172, 183, 194. Defendant Merry was directly involved in carrying out the conspiracy. FNS properly

alleged this fact in multiple places throughout its Amended Complaint.  *See* Amended Complaint at ¶¶ 4, 21-28, 42, 44-47, 49-51, 55-56, 66, 69, 71, 74, 75-81, 85, 93, 99, 104, 113, 119, 125, 133, 144, 147-150, 157, 159, 162-165, 174, 176-178, 180, 182, 184-187, 190, 192-193, 195-98.

Although Morningside's Motion to Dismiss states that the graveman of the Amended Complaint is about Defendant CQ's actions, this assertion ignores the facts set forth in the Amended Complaint that Defendants Morningside, Carr Davis, and O'Brien directly participated in the alleged conspiracy to monopolize the relevant markets and in the illegal conduct in furtherance of the conspiracy.  *See* Amended Complaint at ¶¶ 4, 21-28, 42, 44-47, 49-51, 55-56, 66, 69, 71, 74, 75-81, 85, 93, 99, 104, 113, 119, 125, 133, 144, 147-150, 157, 159, 162-165, 174, 176-178, 180, 182, 184-187, 190, 192-193, 195-98.  This case is as much about Defendants' Morningside's, Carr Davis', and O'Brien's illegal acts, as they were directly involved in the conspiracy with CQ, CQ Transcriptions, and Merry to weaken and drive FNS out of business, as it is about the other Defendants involved in the lawsuit.

Antitrust law long recognized personal jurisdiction over non-resident conspirators in the jurisdiction where the effects of the antitrust conspiracy took place.  *GTE New Media Servs., Inc. v. Ameritech Corp.,* 21 F. Supp. 2d 27, 36 (D.D.C. 1998)(Urbina, J.)(holding that personal jurisdiction was established over non-resident defendants in an antitrust case because their alleged conduct caused harm in the District of Columbia). Further, it is a basic tenet of personal jurisdiction that a party who causes harm or injury in another jurisdiction may be brought under that jurisdiction's authority.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("So long as a commercial actor's efforts

are 'purposefully directed' toward residents of another State, **we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there**.") (emphasis added).  Under the D.C. long arm statute, FNS only needs to allege that Poynter, Times Publishing, Merry, and any other non-resident Defendant either transacted business in Washington, D.C. or caused a tortious injury in Washington, D.C. *Georarackos v. Watts*, NO. 6-1022 (JR), 2007 WL 1541501, at *3 (D.D.C. May 23, 2007); *GTE,* 21 F. Supp. 2d 27 at 36.  FNS is based in Washington, D.C.  *See* Amended Complaint ¶ 1.  The anticompetitive effect and harm resulting from the Defendants' anticompetitive conspiracy alleged in the Amended Complaint is within Washington, D.C., because that is where FNS is based.  *Id.*

The adequacy of a court's exercise of personal jurisdiction over the non-resident Defendants begins with determining whether jurisdiction is proper under the District of Columbia long-arm statute.  *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995).  This Court clearly holds personal jurisdiction over all non-resident Defendants under § 13-423(a)(4) of the District of Columbia long-arm statute because the acts of the non-resident Defendants caused tortious injury in the District of Columbia by acts in and outside this jurisdiction.  *GTE,* 21 F. Supp. 2d at 36-37 (Urbina, J.) (holding that the D.C. district court had jurisdiction over non-resident defendants in an antitrust case under the D.C. long arm statute).  The D.C. long-arm statute states in relevant part as follows:

> (a) A District of Columbia court may exercise personal
> jurisdiction over a person, who acts directly or by an agent, as to
> a claim for relief arising from the person's ... (4) causing tortious
> injury in the District of Columbia by an act or omission outside
> the District of Columbia if he [i] regularly does or solicits
> business, [ii] engages in any other persistent course of conduct, or
> [iii] derives substantial revenue from goods used or consumed or
> services rendered, in the District of Columbia.

D.C. Code § 13-423 (a)(4).

FNS sufficiently alleged a tortious injury in the District of Columbia.  FNS claims that it has been harmed by the anticompetitive plan and conspiracy carried out by Defendants CQ, CQ Transcriptions, and Morningside with the approval of Defendants Poynter and Times Publishing, the parents of CQ and CQ Transcriptions, and under the direction of Defendants Merry, Carr Davis, and O'Brien, who were personally involved in launching and implementing the anticompetitive conspiracy.  *See* Amended Complaint ¶¶ 18, 25-28.  Moreover, the D.C. District Court in *GTE*, said "it makes no difference that the injury [plaintiff] claims to have suffered derived from alleged antitrust violations because an antitrust injury creates a liability in tort."  *GTE,* 21 F. Supp. 2d at 37.  Because FNS's revenue depends, in large part, on the number of customers in the District of Columbia subscribing to its verbatim transcript service, the acts of misappropriation, theft of trade secrets, illegally accessing FNS's databases, violations of antitrust law, tortiously interfering with FNS's actual and potential contracts and business relationships, which result in the loss of customers from FNS's transcripts services foreseeably causes tortious injury to FNS's business in the District of Columbia.  *See* Amended Complaint ¶¶ 73, 81, 90-91, 102, 138, 164, 178, 186, 188-189; *see also GTE,* 21 F. Supp. 2d at 37.

The non-resident Defendants' acts outside and inside of the District of Columbia caused the tortious injury inside the District of Columbia.  FNS alleges that all Defendants joined in a conspiracy to restrain trade and to monopolize the market for fast turnaround verbatim news transcripts of a variety of news events involving the federal government in violation of §§ 1 and 2 of the Sherman Act.  *See* Amended Complaint ¶¶ 130-165.  Specifically, FNS alleges the defendants entered into a conspiracy in September 2004 and that Defendants Morningside and CQ executives communicated with each in furtherance of the conspiracy at Defendant's CQ Transcription's board meetings and normal day to day activities.  *See* Amended Complaint ¶¶ 25-28. Defendants Poynter and Times Publishing knew and approved of the plan to monopolize the market for fast turnaround verbatim news transcripts of a variety of news events involving the federal government.  *See* Amended Complaint ¶¶ 18, 25-28.  As a result, FNS alleges its injuries are caused by the unlawful conspiracy, which was approved by Defendants Poynter and Times Publishing outside the District of Columbia and lasted for at least five years.  *See* Amended Complaint ¶¶ 18, 21-28, 42, 44, 55-56, 71-81, 85, 94, 99, 105, 114, 120, 126, 134, 145, 158, 172, 183, 194.  The non-resident Defendants' anticompetitive plan or scheme is a persistent course of conduct that amounts to more than a simple isolated act.  Therefore, finding personal jurisdiction over the non-resident Defendants is appropriate in this case.  *GTE,* 21 F. Supp. 2d at 37 and 38.

FNS properly alleged that Defendants Poynter, Times Publishing, and Merry were involved in an anticompetitive conspiracy resulting in injury to FNS in Washington, D.C. *See* Amended Complaint  ¶¶ 18, 21-28, 42, 44, 55-56, 71-81, 85, 94, 99, 105, 114, 120, 126, 134, 145, 158, 172, 183, 194.  Even if there were no allegations in the Amended

Complaint regarding jurisdiction, a plaintiff "[has] no obligation to make specific allegations relevant to personal jurisdiction in its complaint because lack of personal jurisdiction is an affirmative defense and so must be raised by the defendant." *Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). *See also Purdue Research Foundation v. Sanofi-Synthelabo S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) ("'[A] complaint need not include facts alleging personal jurisdiction.'").

Defendants Poynter, Times Publishing, Merry, Morningside, O'Brien, and Carr Davis claim that the Amended Complaint contains boilerplate language rather than specific allegations relating to how each participated in the conspiracy, and they maintain that the Amended Complaint lacks specificity regarding the actual conduct by each. Neither contention is correct because the Amended Complaint contains more than enough detail. *See* Amended Complaint ¶¶ 18, 21-28, 42, 44, 55-56, 71-81, 85, 94, 99, 105, 114, 120, 126, 134, 145, 158, 172, 183, 194. In any event, monopolization claims may in fact be alleged in the aggregate:

> An aggregation of claims may produce sufficient proof of violation or injury where violation requires that a certain legal threshold be met and no claim standing alone is sufficient to meet the threshold.

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 310c1 (2008). This aggregation theory has been upheld by the Supreme Court of the United States. *Continental Ore v. Union Carbide*, 370 U.S. 690 (1962) ("plaintiffs should be given the full benefit of their proof, without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). FNS referred to "Defendants" in the original Complaint in plurality because all Defendants were involved

in the conspiracy, and the individual actions and counts were merely methods through which Defendants, including Poynter and Times Publishing, sought to accomplish their anticompetitive goals. *See Key Enterprises of Delaware, Inc. v. Venice Hospital*, 919 F.2d 1550, 1564 (11th Cir. 1990) *vacated on other grounds*, 9 F.3d 893 (11th Cir. 1993) ("It is axiomatic that members of a conspiracy need not be aware of, or consent to each act committed in furtherance of the conspiracy to be held liable as a co-conspirator."). *See also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253-54 (1940). The Amended Complaint, however, now makes clear that Defendants Poynter and Times Publishing were aware of the conduct and that Defendants CQ, CQ Transcriptions, Morningside, Merry, O'Brien, and Carr Davis directly participated in the conspiracy.

Accordingly, the District Court holds personal jurisdiction over all non-resident Defendants.

### C.    The Statute of Limitations Does Not Bar Any of FNS's Claims

Defendants claim many of FNS's allegations lie outside of appropriate statutes of limitations. *See* CQ Motion to Dismiss at 6-8. Normally, where a cause of action is based on wrongful activity occurring over a period of time, the claimant can recover damages only for the wrongful activity occurring within the statutory period. *See, e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 502 n. 15 (1968). Under the "continuing tort" doctrine, however, a party "can recover for all damages resulting from all of defendant's wrongful conduct, ***provided any of it occurred within the statutory period***." *Filloramo v. Johnston, Lemon & Co.,* 700 F. Supp. 572, 575 (D.D.C. 1988) (emphasis added).

FNS alleged a pattern of illegal behavior beginning in September 2004 and continuing through at least March 2009:

- Computer Fraud & Abuse Act:  Amended Complaint at ¶¶ 52-64 show a continuing pattern of unauthorized access to FNS computers and illegal infiltration of FNS's online databases, culminating in March 2009;

- D.C. Uniform Trade Secrets Act:  Amended Complaint at ¶¶ 52-64 show a continuing pattern of infiltrating FNS's databases and utilizing FNS's employees and former employees to illegally obtain FNS's trade secrets through at least March 2009;

- Digital Millenium Copyright Act: Amended Complaint at ¶¶ 65-71 allege violations of this act as recent as March 2009.  Amended Complaint ¶¶ 55-64 allege a pattern of continuing behavior consistent with this incident as far back as 2004;

- Misappropriation: Amended Complaint at ¶¶ 65-71 alleges these claims occurred as recent as March 2009.  Amended Complaint at ¶¶ 55-64 alleges a pattern of continuing behavior consistent with this incident as far back as 2004;

- Tortious Interference: Amended Complaint at ¶¶ 52-74 alleges a continuing pattern of behavior designed to interfere with FNS's existing contracts and business relationships through the spring of 2009;

- Antitrust Claims:  All of the above actions are alleged as the methods or scheme through which Defendants implemented their anticompetitive conspiracies to monopolize as well as their actual attempts to monopolize the market for fast turnaround verbatim transcripts of a variety of news events involving the federal government.  These actions are part of a continuing pattern of behavior in furtherance of the conspiracy.  The latest act in furtherance of the conspiracy occurred in March 2009 and then in September 2009 with the continued pursuit of FNS through the bankruptcy proceedings (Amended Complaint at ¶¶ 25-28, 42-51, 67).

Because all these actions were taken as part of a continuing pattern of wrongful conduct, the majority of which occurred well within the statutory time period, none of FNS's claims are barred by any statute of limitations. *Filloramo*, 700 F. Supp. at 575.[2]

Defendants contend that courts grant partial dismissal for all acts outside the statute of limitations period. To support this contention, Defendant CQ, on page 7 of its memorandum cites to *Barr v. Clinton*, 370 F.3d 1196, 1201 (D.C. Cir. 2004). Defendant CQ states that the D.C. Circuit applied the three year statute of limitations: ["b]ecause [plaintiff] filed his complaint on March 7, 2002, every alleged act that occurred prior to March 7, 1999 is time-barred."). However, the D.C. Circuit was not evaluating a continuing tort. Defendant CQ quotes the language that describes what the district court did in terms of dismissing a complaint on the grounds of statute of limitations. However, the D.C. Circuit stated that "we cannot agree with the district court's analysis." *Barr v. Clinton*, 370 F.3d at 1201. The district court dismissed the entire complaint as untimely, relying largely on the D.C. Circuit's statement in *Hall v. Clinton* that the three-year period begins "when the plaintiff has sufficient notice of the conduct ... which is now asserted as the basis for [his] lawsuit." 285 F.3d 74, 82. (omission in original) (internal quotation marks omitted). In *Hall,* all of the allegedly unlawful conduct occurred *outside* the statute of limitations, and the question was whether the case could nevertheless go forward because the plaintiff filed suit within three years of discovering the allegedly unlawful conduct. *Id.* In *Barr*, the D.C. Circuit dismissed claims that occurred outside the statute of limitations, however, the plaintiff did not allege that any of the alleged

---

[2] *Filloramo* was decided upon a motion for summary judgment not at the motion to dismiss stage. It is premature to make a determination regarding statute of limitations at the motion to dismiss stage. It is more appropriate for a court to make the decision on whether the continuing tort doctrine applies after evidence has been presented. *Resolution Trust Corp. v. Gardner*, 788 F. Supp. 26, 29 (D.D.C 1992).

illegal conduct by the two defendants, who were dismissed from the case, occurred within the statute of limitations. *Barr,* 370 F.3d at 1201. So, the *Barr* case is not on point. Here, FNS alleges that the unlawful conduct occurred within the statute of limitations period. The Amended Complaint contains numerous allegations demonstrating that the illegal conduct, which began as early as September 2004, continued through 2009. These acts that occurred within the statute of limitations period are not separate and distinct acts, rather they are all overt acts in furtherance of the anticompetitive scheme and conspiracy.

When "'a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases.' " *Page v. United States*, 729 F.2d 818, 821 (D.C. Cir. 1984)(citing *Donaldson v. O'Connor*, 493 F.2d 507, 529 (5th Cir. 1974), *vacated on other grounds*, 422 U.S. 563, 95 S.Ct. 2486 (1975). The continuing tort doctrine is invoked because usually no "single incident in a continuous chain of tortious activity" is the cause of significant harm, and because a party should not be permitted to continue tortious conduct. *Page,* 729 F.2d at 821-22.

Undeniably, the equitable tolling and the continuing tort doctrines are applicable here. While Defendants will certainly dispute this contention, the D.C. District Court held that the determination of whether these equitable tolling and continuing tort doctrines apply turn on factual questions which are premature to be decided in a motion to dismiss. *Resolution Trust Corp. v. Gardner*, 788 F. Supp. 26, 29 (D.D.C 1992). FNS has not alleged discrete illegal acts in its Amended Complaint rather FNS alleged a continued course of action undertaken by all of the named Defendants that embodies the anticompetitive conspiracy to restrain competition. *See* Amended Complaint ¶¶ 25-28,

42-81.  Indeed, the Amended Complaint alleges numerous acts that are part of a continuous anticompetitive scheme.  *See* Amended Complaint ¶¶ 25 and 42.  Based upon the allegations in FNS's Amended Complaint, it is premature to conclude that FNS will be unable to assemble facts that would show a continuing tort.  Viewing the facts in the light most favorable to the plaintiff, it is too early for the Court to rule that the continuing tort doctrine is inapplicable.  *Resolution Trust*, 788 F. Supp. at 29.

Similarly, district courts concluded that it is premature to make a determination that equitable tolling is inappropriate at the motion to dismiss stage.  *Resolution Trust*, 788 F. Supp. at 29.  District courts held that the plaintiff may be able to provide evidence of factual circumstances, which will warrant tolling of the statute of limitations because a cause of action does not accrue under District of Columbia law until the time when the plaintiff both should have known of the defendant's actions and suffered actual injury. *See Farmer v. Mount Vernon Realty, Inc.,* 720 F. Supp. 223, 224 (D.D.C. 1989). Moreover, the D.C. Circuit stated:

> There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense.  Although it is true that a complaint sometimes discloses such defects on its face, it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense. The filing of an answer, raising the statute of limitations, allows both parties to make a record adequate to measure the applicability of such a defense, to the benefit of both the trial court and any reviewing tribunal.

*Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981).  FNS is entitled to make a record on whether the statute of limitations defense properly applies.  For all of the above reasons, the District Court should deny Defendants' motions to fully or partially dismiss FNS's claims pursuant to a statute of limitations argument.

**D.     FNS States a Valid Claim for Misappropriation of Hot News**

While the District of Columbia has not had the opportunity to recognize the "hot

news" doctrine, numerous jurisdictions expressly hold that a properly-pleaded "hot news"

misappropriation claim is a valid cause of action, which is not equivalent to a copyright

infringement action and is not preempted by the Copyright Act.  *Associated Press v. All*

*Headline News Corp.*, 608 F. Supp. 2d 454 (S.D.N.Y. 2009) (denying motion to dismiss

while holding that hot news misappropriation is a valid cause of action and is not

preempted by federal copyright laws); *McKevitt v. Pallasch*, 339 F.3d 530, 534 (7th Cir.

2003) (citing to *International News Service v. Associated Press*, 248 U.S. 215 (1918) for

the proposition that the act of copying hot news is not copyright infringement but may be

a form of unfair competition under state law); *NBA v. Motorola, Inc.*, 105 F.3d 841, 845

(2d Cir. 1997) (recognizing the hot news exception is not equivalent to copyright

infringement and the claim is not preempted by the Copyright Act); *Financial*

*Information, Inc. v. Moody's Investor Serv., Inc.*, 808 F.2d 204 (2d Cir. 1986) (same);

*X17 v. Lavandeira*, 563 F. Supp. 2d 1102 (C.D. Cal. 2007) (denying motion to dismiss

and holding that hot news claim is not preempted by Copyright Act); *Pollstar v.*

*Gigmania Ltd.*, 170 F. Supp. 2d 974, 977 (E.D. Cal. 2000) (rejecting the defendant's

arguments that plaintiff's misappropriation and unfair competition claims were

preempted by the Copyright Act and holding that plaintiff sufficiently pled that claim as a

"hot news" claim); *Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc.*, 73 F.

Supp. 2d 1044, 1050 (E.D. Mo. 1999) (holding that under Missouri law a hot news claim

is not preempted by the Copyright Act); *Pottstown Daily News Publ'g Co. v. Pottstown*

*Broadcasting Co.*, 411 Pa. 383, 393 (1963) (holding that hot news claim is not preempted by the Copyright Act).

Section 301(a) of the Copyright Act, 17 U.S.C. § 301(a), provides that after the effective date of the Act, any legal or equitable rights that are equivalent to any of the rights within the general scope of copyright under 17 U.S.C. § 106 in works of authorship, fixed in a tangible medium of expression, are governed only by federal law. As a result, any equivalent common-law or statutory right under state law is preempted and may not be pursued. However, the legislative history of the Copyright Act clearly demonstrates that Congress did not intend to preempt hot news misappropriation claims and that misappropriation is not necessarily synonymous with copyright infringement. The House Report on the 1976 Copyright Act, which the Supreme Court called the "authoritative source for finding the Legislature's intent in enacting the Copyright Act," *Eldred v. Ashcroft*, 537 U.S. 186, 210 (2003), expressly stated that:

> [A] cause of action is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by section 106 or a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (*i.e.*, not the literary expression) constituting 'hot news,' [including] in the traditional mold of *International News Service v. Associated Press*.

H.R. No. 94-1476 at 132, *reprinted in* 1976 U.S.C.C.A.N. at 5748. Based on this clear and unambiguous legislative intent, the Second Circuit held that a hot news claim is not preempted by the Copyright Act. *Financial Information*, 808 F.2d at 209. The Second Circuit reaffirmed this holding in *NBA*. *NBA*, 105 F.3d at 852 ("Our conclusion, therefore, is that only a narrow 'hot-news' misappropriation claim survives preemption for actions concerning material within the realm of copyright.").

FNS pleads each of the five elements of a hot-news claim as defined by *NBA*.  *See* Amended Complaint ¶¶ 82-91.  First, FNS's Amended Complaint alleges that FNS generates or collects news transcripts at "some cost or expense."  *NBA*, 105 F.3d at 852.  *See* Amended Complaint at ¶ 83 ("at substantial economic and professional costs") and Amended Complaint at ¶ 70 ("costly efforts to create, produce, edit, and transmit fast turnaround verbatim transcripts" … "transcription, production, and distribution costs").  Second, FNS alleges that the value of the news it collects is "highly time-sensitive."  *NBA*, 105 F.3d at 852.  *See* Amended Complaint at ¶ 84.  Third, FNS alleges that Defendants' use of the news transcripts gathered by FNS "constitutes free-riding on the plaintiff's costly efforts to generate or collect it," *NBA*, 105 F.3d at 852, because Defendants CQ, CQ Transcriptions, and Morningside merely use FNS news transcripts to create their own transcripts.  *See* Amended Complaint at ¶ 85.  Fourth, FNS alleges that Defendants CQ, CQ Transcriptions, and Morningside directly compete with FNS.  *NBA*, 105 F.3d at 852.  *See* Amended Complaint at ¶ 86.  Defendants contend that FNS does not properly allege the final element required under *NBA* "that the alleged free-riding threatens the existence of the original production of hot news".  CQ Motion p. 27.  However, FNS clearly alleges that "if the Defendants are allowed to continue their free ride . . . the incentives for FNS to produce its transcripts will be substantially reduced, and this reduction in turn jeopardizes the quality and/or existence of FNS's services."  *NBA*, 105 F.3d at 852.  *See* Amended Complaint at ¶ 87.  Moreover, the Amended Complaint alleges that "the existence and/or quality of the services that FNS provides to its customers, subscribers, and other licensees, and thereby to the public, will be substantially threatened" if the Defendants are allowed to continue with their illegal

conduct.  *See* Amended Complaint at ¶ 71.  Defendants CQ, CQ Transcriptions, and Morningside's conduct clearly threatened the existence of FNS because FNS is the only competition to Defendants CQ/CQ Transcriptions/Morningside's transcripts.  *Id.*  As a result, FNS's hot news claim is properly pled and is not preempted by federal law.

The facts and reasoning of the U.S. Supreme Court's decision in *International News Service v. Associate Press* are instructive.  The Associate Press ("AP") and International News Service ("INS") competed in gathering news to be published in newspapers.  AP reporters were covering the U.S. forces in Europe during World War I and the AP transmitted the news almost instantaneously.  INS reporters copied the AP news stories posted on the bulletin board outside of AP member newspapers and provided the news to INS clients.  The Supreme Court concluded that, while the news cannot be copyrighted, the AP was entitled to enjoin INS's copying as a form of unfair competition because INS was taking "quasi property" while it still had value. *International News Service v. Associated Press*, 248 U.S. at 236.  "Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped . . . ." *Id*. at 240.

Allowing Defendants CQ, CQ Transcriptions, and Morningside to misappropriate and sell FNS's current products "render[s] publication profitless, or so little profitable as in effect to cut off the service by rendering cost prohibitive in comparison with the return." *Id*. at 241; *see also* Amended Complaint ¶¶ 71, 87.  While CQ claims that FNS's misappropriation claim is identical to rights protected by the Copyright Act because the news transcripts are copyrighted (CQ's Motion to Dismiss at 27), its reasoning is flawed.

News transcripts cannot be protected by the copyright laws because the news transcripts are recitations of facts and facts are not protected by the copyright laws. *Sparaco v. Lawler, Matusky & Skelly Eng'rs LLP*, 303 F.3d 460 (2d Cir. 2002) (holding that it is well settled that copyright law does not protect facts from being copied). Moreover, even if the transcripts were copyrighted, there is nothing in the case law suggesting that the material at issue must be "copyrightable" or not. *X17*, 563 F. Supp. 2d at 1108. The Second Circuit and the legislative history cited above reaffirms the Supreme Court's holding that the producer of hot news has a property right in its work separate from the copyright laws. *NBA*, 105 F.3d at 845. The Second Circuit further explained that the hot news misappropriation claim is not preempted because the cause of action contains extra elements not essential to a copyright infringement claim, including "(i) the time-sensitive value of factual information, (ii) the free-riding by a defendant, and (iii) the threat to the very existence of the product or service provided by the plaintiff." *Id.* at 853; see Amended Complaint ¶¶ 82-91. FNS properly alleges these three elements that are not essential to a copyright infringement claim. *Id.* Unlike copyright, which essentially protects the particular expression of an idea, these elements protect the plaintiff's interest in, among other things, the time-sensitive nature of the information and the investment associated with collecting the time-sensitive data. *NBA*, 105 F.3d at 845.

The only authority that Defendant CQ cites holding that hot news claims are preempted is *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737 (D. Md. 2003). To the extent that this decision disagrees with the numerous jurisdictions that hold that hot news claims are not preempted by federal law, *Lowry's* is not controlling precedent in the D.C. Circuit and must be disregarded. *Lowry's* is not persuasive

compared to the numerous jurisdictions that viewed this issue differently, and adds little to the analysis given its limited, conclusory decision citing only to a law review article and ignoring the legislative history.  Further, *Lowry's* questions the validity of *NBA*'s "extra" elements with reasoning that has been described by other courts as "puzzling." *X17*, 563 F. Supp. 2d at 1106 (characterizing the decision in *Lowry's* as puzzling because the California District Court found no support for *Lowry's* suggestion that only actions can constitute an "element of a claim").  Finally, *Lowry's* itself recognizes that "[s]ome 'hot-news' claims may yet survive," preemption (271 F. Supp. 2d at 756), and a different judge in the District of Maryland previously held that hot news claims are not preempted by copyright law (*Lowry's Reports, Inc. v. Legg Mason, Inc.*, 186 F. Supp. 2d 592, 595 (D. Md. 2002)).

Defendants cite other cases that are not on point for the proposition that FNS failed to allege that the misappropriation constituted or constitutes a threat to FNS's ability to engage in transcription production such as *Scranton Times, L.P. v. Wilkes-Barre Publ'g Co.*, No. 3:08-cv-2135, 2009 WL 3100963, at *6 (M.D. Pa. Sep. 24, 2009) (dismissing claim because a newspaper plaintiffs' complaint failed to allege that the misappropriation of its obituary information "posed[d] a threat to the existence of Plaintiffs' publications or those publications to continue.") and *Fred Wehrenberg Circuit of Theatres, Inc. v Moviefone, Inc.*, 73 F. Supp. 2d 1044, 1050 (E.D. Mont. 1999).  In *Scranton*, the plaintiff, a newspaper, did not allege that its existence was threatened by the misappropriation of obituary information rather the only allegation was that its business was harmed by its competitor that was stealing its obituary information. *Scranton* at *15.  In *Fred Wehrenberg*, the Eastern District of Montana held that plaintiff

could not prove the last element of a hot news claim because "the core of plaintiff's business and the source of the majority of its profits is not the publication of movie schedules, even though plaintiff contends it receives some revenue in exchange for its movie schedules.  The core of plaintiff's business is exhibiting movies and the profit it makes from ticket and concession sales" so the misappropriation of movie schedules does not threaten its business.  *Fred Wehrenberg*, 73 F. Supp. 2d at 1050.  Clearly, the misappropriation complained of in *Scranton* and in *Fred Wehrenberg* is different from the alleged misappropriation of transcripts that threatens FNS's ability to stay in business because the transcription business is the primary business for FNS, whereas the obituary portion of the Scranton newspaper was not its primary business and the ability for the plaintiff in *Fred Wehrenberg* to publish movie schedules was not its primary business.  As already, stated, FNS properly alleged the threat to its existence.

FNS properly pled a claim for hot news misappropriation and Defendants' Motions to Dismiss should be denied.

### E.      FNS States a Valid Claim Under the D.C. Uniform Trade Secrets Act

Defendants claim that FNS did not "identify any 'trade secret' that defendants allegedly obtained."  CQ Motion to Dismiss at 8.  However, FNS explicitly alleges misappropriation and theft of its customer lists, which included "specific individual contacts at each customer, but also provided their contractual information, including how much each customer was paying FNS for transcript services."  *See* Amended Complaint at ¶¶ 53-54.  FNS further alleges multiple subsequent infiltrations of its databases from November 2004 through at least 2009.  *See* Amended Complaint at ¶¶ 55-64.  While defendants may not think that a customer list containing specific pricing data can be a

trade secret, "[t]he cases are legion in which customer lists have 'been held to be property in the nature of a trade secret' for which an employer is entitled to protection." *Ruesch v. Ruesch Int'l Monetary Servcs., Inc.*, 479 A.2d 295, 296 (D.C. 1984); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 76 (D.D.C. 2001) (Urbina J.) (citing to *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Zimmerman*, 1996 WL 707107 *2 (D. Kan. 1996) and *IDS Financial Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994)).  The Restatement of Torts  notes that customer lists are within its description of trade secrets, which include the following:

> any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.  It may be a formula for a chemical compound, . . . or a list of customers.

4 Restatement of Torts § 757, comment b, at 5 (1939).  Defendants have no basis upon which their contentions may stand.  As stated, customer lists are often deemed to be trade secrets.  Whether this particular customer list alleged in FNS's Amended Complaint is a trade secret is a matter of factual inquiry, and it would be improper to dismiss this claim under Fed. R. Civ. P. 12(b)(6) at this time.  *In re Rail Freight Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 31 (D.D.C. 2008) ("the district court must accept as true all of the factual allegations contained in the complaint."); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 79 (D.D.C. 2007)(holding that the question of "whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.'" quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978)).

District of Columbia courts have a minimal standard for sufficiency of trade secrets pleadings, and "[a]ll that is required when [it] consider[s] the sufficiency of the

pleading is a short and plain statement of the claim" that "give[s] the defendant fair notice of what the [pleader's] claim is and the grounds upon which it rests[.]"  *Soler, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009).  Three elements must be alleged for a violation of the D.C. Uniform Trade Secrets Act: 1) existence of a trade secret; 2) acquisition of a trade secret as a result of confidential relationship; and 3) unauthorized use of secret resulting in loss or damages.  *Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 7-8 (D.D.C. 2004).  FNS alleged all three elements in the Amended Complaint.  *See* Amended Complaint at ¶¶ 54, 93.

Accordingly, FNS's customer list, which includes specific pricing data regarding each customer is a trade secret.  It is, therefore, not appropriate to grant Defendants' Motions to Dismiss.

> **F.      FNS States a Valid Claim under the Computer Fraud and Abuse Act**

FNS properly alleges multiple violations of the Computer Fraud and Abuse Act ("CFAA") by not only Ms. Pennell, but also by other unknown employees and/or agents of Defendants CQ and Morningside, beginning in 2004 with the actions taken by Ms. Pennell and culminating in at least March 2009.  *See* Amended Complaint ¶¶ 52-64, 103-129.  In fact, FNS's allegations regarding the CFAA are so detailed that they include exact dates on which operators at Defendant owned and operated IP addresses illegally invaded FNS's databases, which allegedly occurred from November 2004 through at least March of 2009.  *See* Amended Complaint ¶¶ 55-64.

FNS properly alleged violations of the CFAA.  A violation of 18 U.S.C. § 1030(a)(5) occurs whenever a person "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage." 18

U.S.C. § 1030(a)(5)(B); *Physicians Interactive v. Lathian Sys., Inc.*, No. 03-1193, 2003 WL 23018270, at *6 (E.D. Va. Dec. 5, 2003).  In order for a plaintiff to bring a civil suit against a defendant pursuant to § 1030(a)(5)(B) and § 1030(a)(5)(C), the defendant's conduct must satisfy one of the statute's enumerated provisions.  FNS alleges that the Defendants caused "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I) (2009); *Ford v. Torres*, No. 1:08cv1153, 2009 WL 537563 at *8 E.D. Va. March 3, 2009).  *See* Amended Complaint ¶¶ 110, 116, 122, 128.  According to § 1030(e)(11), loss under the CFAA "means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11) (2009).

Given that Rule 12(b)(6) is a disfavored motion, and accepting the allegations of the Amended Complaint as true and in the light most favorable to the plaintiff, this Court should hold that FNS sufficiently stated a claim under the CFAA.  Indeed, the District Court of Maryland recently held that a motion to dismiss should be denied when facts similar to the facts set forth in FNS's Amended Complaint have been properly alleged. *See CoStar Realty Information, Inc. v. Field*, 612 F.Supp.2d 660 (D. Md. 2009)(denying motion to dismiss of CFAA claim because plaintiff's allegation regarding the loss of license fees is sufficient for damages under the CFAA).

In *CoStar*, the plaintiff, CoStar, alleged that it suffered damages through defendants' violation of the CFAA when defendants illegally accessed plaintiff's online database.  *Id.* at 674.  FNS is alleging that it suffered damages when agents and/or

employees of Defendants Morningside, CQ, and CQ Transcriptions illegally accessed FNS's online database.  *See* Amended Complaint ¶¶ 55-64.  In *CoStar*, the plaintiff failed to allege on which provision of the CFAA statute plaintiff was relying, but the district still did not dismiss the claim.  *CoStar*, 612 F.Supp.2d  at 674.  The defendants in *CoStar* argued that plaintiff did not state a loss as defined by the statute because they contended that loss should be interpreted as a loss of interruption of service.  *Id.*  This contention is not different from what Defendant CQ is now contending that FNS has not properly alleged damages under the CFAA.  CQ Motion to Dismiss, p. 10.  The defendants in *CoStar* further argued that plaintiff did not suffer an interruption of service based on the illegal access to the database because plaintiff still maintained the use of the database with no interruption of its service.  *CoStar*, 612 F.Supp.2d  at 674.  The district court found merit in CoStar's argument that the defendants' unauthorized access to plaintiff's online database caused damages in the form of lost revenue from the plaintiff's failure to recover license fees.  *Id.* at 675.

FNS's Amended Complaint exceeds the pleading standard articulated by *CoStar*. FNS alleges that the unauthorized access of its databases by Defendants Morningside, CQ, and CQ Transcriptions caused damages in the form of "lost sales, lost revenues, lost future income, lost investment capital, loss of potential sales value of the corporation, loss of the value of its products and proprietary technology, and a decline in FNS's business."  *See* Amended Complaint ¶ 90.  In addition, FNS alleges that it suffered other damages from the unauthorized access by agents/employees of Defendants Morningside, CQ, and CQ Transcriptions such as "lost profits and increased costs of capital for security."  *See* Amended Complaint ¶ 80.  In denying the motion to dismiss, the

Maryland District Court in *CoStar* held that plaintiff adequately pled the jurisdictional amount for loss required under the statute when it described its damages as lost license fees. *CoStar*, 612 F.Supp.2d at 675. Undoubtedly, FNS adequately pled the jurisdiction amount for loss required under the CFAA.

Defendant CQ contends that FNS failed to state a claim under 18 U.S.C. § 1030(a)(4) because Ms. Pennell's unauthorized access to confidential business information on FNS computers, which was then delivered to Defendant O'Brien of Morningside, does not involve an intent to defraud and the allegations regarding the unauthorized access to FNS's online database whereby the defendants stole the transcripts and then passed them off as their own product did not involve unauthorized computer access. CQ Motion to Dismiss, p. 11. These contentions are without merit and should be dismissed. First, all of these unauthorized accesses of FNS computers and FNS's online databases from November 2004 through at least March 2009 are related because they are part of the overall plan to weaken FNS's business and cause FNS financial harm. *See* Amended Complaint ¶¶ 52-54 and ¶¶ 55-71. Second, Ms. Pennell's conduct described in the Amended Complaint specifically states that she stole confidential business information, which has value, and delivered those materials to Defendant O'Brien of Morningside in furtherance of the scheme. *See* Amended Complaint ¶¶ 52-54. Third, Defendants CQ, CQ Transcriptions, and Morningside's unauthorized accesses of FNS's online database are actionable under the CFAA. *CoStar*, 612 F.Supp.2d at 675.

Defendants' bald assertion that Count Four should be dismissed because interstate commerce was not involved is supported by neither facts nor law, and is absurd in light

of the intent and authority of Congress in enacting the statute.  *See United States v. Trotter*, 478 F.3d 918 (6th Cir. 2007) (holding a computer used to communicate with computers outside of the state was used in interstate commerce under the CFAA).  *See also* Raymond T. Nimmer & Holly K. Towle, The Law of Electronic Commercial Transactions ¶ 3.05[2] (2009) (noting the CFAA "essentially includes any computer connected to the internet, and, thus, for e-commerce systems, virtually all sites and systems of relevance.").  The Amended Complaint alleges sufficient detail to put the defendants on notice that the relevant conduct constituted an interstate communication. *See* Amended Complaint ¶¶ 6-14, 52-71, 106, 109.  The protected computers and the online databases are used in interstate commerce and the alleged conduct of illegally accessing the online database involved an interstate or foreign communication.  *See* Amended Complaint ¶106 ("intentionally accessed an FNS computer used for interstate commerce or communication"), and Amended Complaint ¶109 ("such conduct involved interstate or foreign communication").  Defendants misrepresent the allegations set forth in Count Four as focusing on Ms. Pennell so they can argue that Count Four is time barred, but clearly the allegations set forth in Count Four state that "Ms. Pennell, CQ employees, and other individuals, who, acting as agents and instrumentalities of Defendants CQ, CQ Transcriptions, and Morningside, intentionally accessed FNS computers and online databases without authorization."  *See* Amended Complaint ¶ 104.

For all of the above reasons, Defendants' Motions to Dismiss Counts Four through Seven for violations of the CFAA should be denied.

### G.     FNS Properly States Valid Claims for All the Antitrust Counts

"On a motion to dismiss under Rule 12(b)(6), courts "must accept as true all of the factual allegations contained in the complaint." *In re Rail Freight Antitrust Litig.*, 587 F. Supp. 2d at 28.  Courts must construe the complaint "liberally in the plaintiffs' favor, and grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Id.*  Further, claims shall not be dismissed simply because the trial judge may not believe the allegations or feels that recovery is remote or unlikely.  *See Twombly*, 550 U.S. at 555 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable.").

FNS's Amended Complaint consists of 57 pages and 199 paragraphs of detailed factual allegations — it is not an "unadorned, the-defendant-unlawfully harmed me accusation" (*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949), but, in fact, it is a claim "stated adequately, [that] may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.  *Twombly* further rejects the notion, apparently proffered here by Defendants' Motions to Dismiss that Fed. R. Civ. P. 12(b)(6) requires tediously detailed factual allegations.  127 S. Ct. at 1964-65.  In fact, the pleading rules are "not meant to impose a great burden upon a plaintiff" (*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005)), and requires simply that the "complaint must say enough to give the defendant 'fair notice of what the plaintiffs claim is and the grounds upon which it rests.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007).

Further, the plaintiffs in *Twombly* alleged parallel conduct as the basis of their conspiracy claim, with the agreement alleged through "mere [] legal conclusions resting on the prior allegations." *Twombly*, 550 U.S. at 564.  Unlike in *Twombly*, FNS sets forth an

agreement to conspire (Amended Complaint at ¶ 25), a date when the conspiracy was alleged

to have begun (Amended Complaint at ¶ 25 "September 2004"), and detailed allegations of

conduct in furtherance of this conspiracy.  Amended Complaint at ¶¶ 42-150, 179-199.  *See*

*In re Rail Freight Antitrust Litig.*, 587 F. Supp. 2d at 32 ("The plaintiffs here have alleged

substantially more [than required by *Twombly.*]").  "They allege that the defendants entered

into an agreement, that this agreement had the illicit purpose . . ., and that the defendants

actually used the agreed upon mechanism to restrain trade."  *Id.*  Similarly, these are not

merely legal conclusions in FNS's Amended Complaint, but a specifically alleged legal

theory supported by fifty seven pages of factual allegations.  *See Iqbal*, 129 S. Ct. at 1940

("While legal conclusions can provide the framework of a complaint, **they must be supported**

**by factual allegations**.") (emphasis added).

Defendants' Motions to Dismiss contend that the Amended Complaint does not

allege the roles played by the co-conspirators.  CQ's Motion to Dismiss, p. 13 and

Morningside's Motion to Dismiss 15-17.  Counts Eight through Eleven of the Amended

Complaint specifically set forth antitrust conspiracies in violation of §§ 1 and 2 of the

Sherman Act, and the D.C. Unfair Trade Practices Act.  All Defendants participated in

this conspiracy, and the factual allegations set forth the actions taken by the various

Defendants in their individual and corporate capacities in furtherance of these

anticompetitive violations.  *See* Amended Complaint at ¶¶ 25-28, 42-81.  The Amended

Complaint specifically states that in September 2004, Defendants Merry of CQ, and Carr

Davis and O'Brien of Morningside agreed to carry out an anticompetitive plan to drive

FNS out of business.  *See* Amended Complaint at ¶ 25-28.  Defendants Merry, Carr

Davis, and O'Brien personally participated in the conspiracy by directing employees

and/or agents to carry out their anticompetitive plan.  *See* Amended Complaint at ¶ 25-28,

42-81.  The plan was carried out "by engaging in corporate espionage and corporate theft

on a grand scale", by engaging "in systematic, illegal access to and taking from FNS's

computers and online databases," by gaining "repeated and unauthorized access, in many

cases by use of pretextual customer login credentials, to FNS's proprietary, password-

protected customer website," by altering "the transcripts, remov[ing] FNS copyright and

trademark notices, replac[ing] them with CQ copyright and trademark notices,

provid[ing] those stolen transcripts to CQ's clients as CQ's and Morningside's own work

product," and by implementing various sales tactics designed to harm FNS and

competition.  *See* Amended Complaint at ¶ 25-28.  The Amended Complaint alleges that

Defendant Merry personally participated in the effort to acquire FNS and to eliminate

FNS's employees as well as directing the sales team to misrepresent information in the

market place about FNS and to implement a bundling scheme designed to take business

from FNS.  *See* Amended Complaint at ¶¶42-81.  The Amended Complaint alleges that

Defendant O'Brien personally participated in the stealing of FNS business information

and had direct communications with Ms. Pennell relating to her efforts in working with

Defendants CQ, CQ Transcriptions, and Morningside to steal confidential information, as

well as directing employees and/or agents to carry out the anticompetitive plan.  *See*

Amended Complaint at ¶ 25-28, 42-81.  The Amended Complaint alleges that Defendants

Carr Davis and O'Brien directly participated in the conspiracy and directed their

employees and/or agents to carry out the anticompetitive plan.  *See* Amended Complaint

at ¶¶ 25-28, 42-81.  These detailed allegations easily meet the requirements for both Fed.

R. Civ. P. 8 and 12.  *See Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116,

1122 (9th Cir. 2008) ("This is not an onerous burden. 'Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests.") quoting *Erickson v. Pardus*, 551 U.S. 89 (2007).

A conspiracy to monopolize, exactly what is alleged by FNS in its Amended Complaint, may be proven through an aggregation of smaller claims. *Continental Ore v. Union Carbide*, 370 U.S. 690, 699 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (citations omitted). Areeda and Hovenkamp recognize the legitimacy of this tenet as well:

> An aggregation of claims may produce sufficient proof of violation or injury where violation requires that a certain legal threshold be met and no claim standing alone is sufficient to meet the threshold.

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 310c1 (2008).

Defendants avoid addressing the aggregation theory and spend a great deal of time discussing how each individual action does not rise to the level of anticompetitive conduct. But, they do not once deal with the clear allegation by FNS that it is the aggregation of these acts that has caused the harm and the anticompetitive effect in the markets. FNS clearly alleged a conspiracy to monopolize the market for fast turnaround verbatim transcripts of a variety of news events involving the federal government through the use of these actions. *See Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980) ("Probably no one of the instances of improper conduct, standing alone, would lead to §2 liability. Taken together, however, they show a pattern of exclusionary behavior sufficient to support [§2 liability]."); *Conwood Co. L.P. v. United States Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) ("[Defendant] contends

that none of the practices [plaintiff] complains of amount to antitrust violations, but are no more than isolated, sporadic torts.  We disagree. . . . [Plaintiff] presented sufficient evidence that [defendant] sought to achieve its goals of excluding competition and competitors' products by numerous avenues.").  *See also* Amended Complaint at ¶¶ 25-28, 42-81 (detailing the plan and scheme to drive FNS out of business and thereby cause harm to competition).

Each Defendant proffered a boilerplate Motion to Dismiss based upon the isolated arguments that each individual action alleged in the Amended Complaint does not individually amount to anticompetitive conduct or antitrust harm.  This type of defense, however, has been solidly rejected:

> [Defendants] would have us consider each separate aspect of its
> conduct separately and in a vacuum.  If we did, we might agree
> with the [defendants] that no one aspect standing alone is illegal.
> It is the mix of the various ingredients of [defendants'] behavior
> in a monopoly broth that produces the unsavory flavor.

*City of Mishawaka v. Am. Elec. Power Co., Inc.*, 616 F.2d 976, 986 (7th Cir. 1980).  This defense is particularly inappropriate in a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), because "it is the jury which 'weighs the contradictory evidence and inferences' and draws 'the ultimate conclusion as to the facts.'"  *Continental Ore*, 370 U.S. at 700-01.

While the Morningside Defendants correctly cite *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), for the proposition that a company may not conspire with itself, this citation is merely a sleight of hand to deflect attention from the fact that Defendant Morningside is in fact a separate entity and is capable of conspiring with Defendants Poynter, Times Publishing, CQ, and CQ Transcriptions.

Morningside Motion to Dismiss, p. 17; *Copperweld* further held, however, that "[a]n affiliation 'flowing from an illegal conspiracy' would not avert sanctions." *Copperweld*, 467 U.S. at 761.  This affiliation is in fact what is alleged in the Amended Complaint. *See* Amended Complaint at ¶¶ 25-28.  The fact that Defendants Carr Davis and O'Brien are partners in Morningside as well as members of the board of directors at Defendant CQ Transcriptions does not envelop them in some sort of fantasy *Copperweld* immunity (*see* Morningside Defendants' Motion to Dismiss at 17) — in fact, it is this very interconnection that makes an anticompetitive conspiracy between the entities eminently plausible.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253-54 (1940) ("For a conspiracy is a partnership in crime; and an 'overt act of one partner may be the act of all without any new agreement specifically directed to that act.'"); *Conwood*, 290 F.3d at 784 ("the trier of facts may make a just and reasonable estimate . . . based on relevant data and may act upon probable and inferential . . . proof.").

Defendants also contend that all the antitrust claims should be dismissed because no anticompetitive effect has been alleged (*see* CQ Motion to Dismiss at 20-24), FNS alleges the harm to competition over nearly three pages in the Amended Complaint (*see* Amended Complaint at ¶¶ 75-81).  The Amended Complaint specifically states how all of the alleged conduct and violations of law in the aggregate "prevented and continues to prevent FNS from fully competing in the marketplace, thereby injuring consumers and competition in the markets for fast turnaround verbatim transcripts of a variety of news events involving the federal government." *See* Amended Complaint ¶ 80.  Moreover, the Amended Complaint states that the anticompetitive scheme, including all the illegal conduct by each of the defendants:

> caused and continue to cause substantial harm to the business of
> FNS in the form of artificially constrained market share, lost
> profits, and increased costs of capital for security.  Additionally,
> that same conduct had, and continues to have, a direct,
> substantial, and reasonably foreseeable effect on FNS's ability to
> sell fast turnaround verbatim transcripts of a variety of news
> events involving the federal government to its customers.  The
> unlawful conduct injured and continues to injure competition, by,
> among other things, decreasing quality and increasing costs for
> fast turnaround verbatim transcripts of a variety of news events
> involving the federal government.

*See* Amended Complaint ¶ 81.  Furthermore, FNS alleges predatory conduct

harming competition:

> We define monopolistic conduct as acts that: (1) are reasonably
> capable of creating, enlarging, or prolonging monopoly power by
> ***impairing the opportunities of rivals***; and (2) that either (2a) do
> not benefit consumers at all, or (2b) are unnecessary for the
> particular consumer benefits claimed for them, or (2c) produce
> harms disproportionate to any resulting harm.

Areeda & Hovenkamp at § 651a (emphasis added).  *See also Conwood*, 290 F.3d at 783

("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is

fair to characterize its behavior as predatory [or exclusionary.]").  FNS alleged in great

detail both conduct that has, and is reasonably capable of, impairing the opportunities of

FNS, and FNS also alleged that this conduct produced disproportionate harm on

competition:

- Amended Complaint at ¶¶ 25-28, 42-81 (describing the conspiracy to
  drive FNS out of business including attempts to acquire FNS and
  eliminate its employees, engaging in corporate espionage and corporate
  theft, hiring away key FNS employees, bundling non-transcript products
  with transcript products at no cost to disadvantage FNS, and interfering
  with FNS's business relationships with its actual and prospective
  customers);

- Amended Complaint at ¶¶ 52-71 (describing a pattern of misappropriation
  of FNS material and inappropriate breaches of FNS online databases);
  and,

- Amended Complaint at ¶¶ 72-74 (describing unfair and unjustified attack tactics used by defendants upon FNS's business).

All of this illegal conduct in aggregate caused anticompetitive effect and harm to competition, which was specifically alleged in the Amended Complaint.  Indeed, the Amended Complaint specifically alleged that the conduct "prevented and continues to prevent FNS from fully competing in the marketplace, thereby injuring consumers and competition" (Amended Complaint at ¶ at 80) and "the unlawful conduct injured and continues to injure competition, by, among other things, decreasing quality and increasing costs."  *See* Amended Complaint at ¶ at 81.  *See also Conwood*, 290 F.3d at 784 ("merely because a particular practice might be actionable under tort law does not preclude an action under the antitrust laws as well.  'Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator to have enumerated all the varieties.'") *quoting Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)).

Further, not only has FNS specifically alleged anticompetitive exclusion and anticompetitive effect, it alleged the elements of a conspiracy to monopolize:  the requisite agreement (Amended Complaint at ¶¶ 25-28, 42), an intent to monopolize (Amended Complaint at ¶ 48) ("CQ's LOI made clear that FNS employees would not be retained by CQ, demonstrating the sole purpose for the acquisition was to eliminate competition", and one or more acts in furtherance of the conspiracy (Amended Complaint at ¶¶ 42-74).  *See Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1556 (11th Cir. 1996) ("a plaintiff proves a [Sherman Act] § 2 conspiracy to monopolize by showing: '(1) concerted action deliberately entered into with the specific intent of

achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy.'"); *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (noting that a Sherman Act § 2 conspiracy requires (1) existence of a conspiracy; (2) an overt act in furtherance; (3) intent to monopolize; and (4) causal antitrust injury); *AD/SAT v. Associated Press*, 181 F.3d 216, 233 (2d Cir. 1996) ("A successful conspiracy claim under [Sherman Act] § 2 requires '(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.'"); *Baxley-DeLamar Monuments, Inc. v. Am. Cemetery Ass'n*, 843 F.2d 1154, 1157 (8th Cir. 1988) ("noting that a [Sherman Act] § 2 conspiracy needs to plead conspiracy, intent to monopolize, and overt acts in furtherance); *Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1484 (10th Cir. 1989) ("Conspiring to monopolize . . . require[es] less in the way of proof than the other section 2 offenses."). *See also* Areeda & Hovenkamp at ¶ 809.

Moreover, FNS alleged market power and market definition (*see* Amended Complaint at ¶¶ 29-41), fulfilling the pleading requirements for a Sherman Act § 2 monopolization claim. *See Baxley-DeLamar*, 843 F.2d at 1157 ("In order to recover for individual attempts . . . to monopolize such markets, it would indeed be necessary for [plaintiff] to show [the defendants] had sufficient economic power to pose a dangerous probability of success."); *Levine*, 72 F.3d at 1555 ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power . . . ."). This level of pleading gives extra credence and plausibility to FNS's allegations of monopolization.

*See Conwood Co. LP v. U.S. Tobacco Corp.*, 290 F.3d 768 (6th Cir. 2002) (some kinds of tortious behavior could anticompetitively create or sustain a monopoly and warrant condemnation under § 2 in the presence of monopoly power).

### G.    FNS Properly Pled Claims for Tortious Interference

To establish a claim of tortious interference with contract or with contractual relations, four things must be alleged:  1) existence of a valid contract or other business relationship; 2) defendants' knowledge of the contract or business relationship; 3) defendants' intentional interference; and 4) resulting damage.  *NCRIC, Inc. v. Columbia Hospital for Women Medical Center, Inc.*, 957 A.2d 890, 900 (D.C. 2008); s*ee also Kreuzer v. George Washington Univ.*, 896 A.2d 238, 247 (D.C. 2006) ("To establish a prima facie case of interference with business relations, a plaintiff must show that the interference was intentional and that there was resulting damage.").  The District of Columbia follows closely the language of the Restatement, which defines the offense of tortious interference with contract as:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979).

Further, there is no requirement that the plaintiff even allege the defendants' conduct was wrongful — "it is the defendant who bears the burden of proving that it was not [wrongful]."  *NCRIC*, 957 A.2d at 901.  FNS properly alleged all aspects of both a tortious interference with contract claim and a tortious interference with business relations claim.  The Amended Complaint at ¶¶ 52-54 allege that Defendants induced

former FNS employees to violate their competition clauses in their contracts with FNS,

and that Defendants were aware of the nature of these contracts.  The Amended

Complaint at ¶¶ 55-64 further allege Defendants induced people still employed at the

time by FNS to break their contracts, as well as alleging that Defendants purposefully

induced customers of FNS to violate their terms of services agreements with FNS.  The

Amended Complaint at ¶¶ 66 and 72 allege violations of current and future business

relationships with specific actual and prospective clients including the "Department of

Defense Public Affairs Office" and "including the Department of the Air Force and the

Department of the Army."  The Amended Complaint at ¶ 72 alleges that "CQ continually

told existing and potential customers that FNS would not be in business much longer,

misrepresenting FNS's financial position even though CQ has no knowledge regarding

FNS's financial position.  This behavior further exhibits CQ's anticompetitive intent, as

well as CQ's intent to interfere with FNS's contracts and contractual relationships." The

Amended Complaint at ¶¶ 179-199 alleges specifically the individual components of both

tortious interference with contract and business relations based on these activities.

IV.     **CONCLUSION**

FNS "provided robust factual details in its Amended Complaint supporting [its]

'independent allegation of actual agreement' from which the Court can infer that it is

plausible that an actual agreement existed."  *In re Rail Freight Litig.*, 587 F. Supp. 2d at

34.  FNS alleged in "robust factual details" the launching of the conspiracy and the acts

and practices by which Defendants' anticompetitive scheme was carried out.  In sum, the

words of Justice Souter in *Twombly* seem most appropriate:  FNS "nudged the alleged

[conspiratorial] claims across the line from conceivable to plausible" and, as such, FNS's

Amended Complaint must stand.  *Twombly*, 550 U.S. at 547.

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Respectfully submitted this 13th day of November 2009.


/s/ Andre Barlow
Robert W. Doyle, Jr. (Bar No. 285429)
Andre P. Barlow (Bar No. 465683)
Camelia C. Mazard (Bar No. 461778)
**DOYLE, BARLOW & MAZARD PLLC**
1350 I Street, N.W. Suite 850
Washington, D.C. 20005
T: (202) 589-1834
F: (202) 589-1819
rdoyle@dbmlawgroup.com
abarlow@dbmlawgroup.com
cmazard@dbmlawgroup.com

**CERTIFICATE AND NOTICE OF ELECTRONIC SERVICE**

I, André P. Barlow, hereby certify that on November 13, 2009, I served the foregoing **Federal News Service's Consolidated Opposition to Motions to Dismiss on behalf of Poynter Institute for Media Studies, Times Publishing Company, Congressional Quarterly, Inc., CQ Transcriptions, Inc., Morningside Partners, LLC, Stephen Carr Davis, Anthony O'Brien and Robert Merry** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record who consented to electronic service as identified on the Notice of Electronic Filing.

/s/ André Barlow
André P. Barlow

Drew S. Marrocco
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC  20005
dmarrocco@sonnenschein.com

Robert Andalman
Loeb & Loeb LLP
321 N. Clark Street
Suite 2300
Chicago, IL  60654
randalman@loeb.com

***Counsel for Defendants Morningside Partners LLP, Stephen Carr-Davis, and Anthony O'Brien***

Joseph S. Hall
Mark C. Hansen
Michael K. Kellogg
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, NW
Washington, DC  20036
jhall@khhte.com
mhansen@khhte.com
mkellogg@khhte.com

***Counsel for Defendants Poynter Institute for Media Studies, Times Publishing Company, Congressional Quarterly, Inc., CQ Transcriptions, Inc., and Robert Merry***